GUY L. WAGGONER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

DOROTHY WAGGONER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

E. P. WAGGONER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HELEN WAGGONER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 25074, 25075, 25076, 25077. Promulgated October 16, 1950.

---

*R. B. Cannon, Esq.*, for the petitioners.
*J. Marvin Kelley, Esq.*, for the respondent.

OPINION.

LeMire, *Judge:* These proceedings, consolidated for hearing, involve deficiencies in income tax as follows:

| Petitioner | Docket Number | Deficiency | |
|---|---|---|---|
| | | 1943 | 1944 |
| Guy L. Waggoner | 25074 | | $2,404.80 |
| Dorothy Waggoner | 25075 | $2,005.94 | 5,125.72 |
| E. P. Waggoner | 25076 | | 4,787.93 |
| Helen Waggoner | 25077 | | 4,787.93 |

The sole question in issue is whether a gain which the petitioners realized from the receipt of compensation from the United States Government in 1944 for damage to, destruction of, or conversion of property which the Government had occupied as lessee is taxable to the petitioners as ordinary income or as long term capital gain. Adjustments made by respondent of the 1943 tax liability of petitioner Dorothy Waggoner have been agreed upon and will be given effect under Rule 50.

The facts are set out in a written stipulation which, together with documents attached thereto, we adopt as our findings. The material facts are as follows:

The income involved in the proceedings bearing Docket Nos. 25074 and 25075 is the community income of petitioners Guy L. Waggoner and Dorothy Waggoner, who are husband and wife residing in Fort Worth, Texas. The income involved in Docket Nos. 25076 and 25077 is the community income of petitioners E. P. Waggoner and Helen Waggoner, who are husband and wife residing in Fort Worth, Texas. All of the petitioners filed their individual income tax returns for 1944 with the collector of internal revenue for the second district of Texas.

Throughout 1944 petitioners Guy L. Waggoner and E. P. Waggoner were equal partners in a partnership organized on December 11, 1934, known as Three D's Stock Farm. On July 17, 1942, and for several years prior thereto, Three D's Stock Farm owned, among other properties, a tract of land near Arlington, Texas. Part of the tract, known as Arlington Downs, was improved with grandstands, a club house, a secretary's office building, and other facilities suitable for holding race meets. Prior to 1937 Arlington Downs was rented to the Texas Jockey Club for the purpose of holding race meets. After 1937 the premises were no longer rented for that purpose, and the partnership

abandoned the improvements used in holding race meets and charged off as a loss on its income tax return the undepreciated cost thereof, less the salvage value. Some of the improvements were actually wrecked and the salvage sold. Other improvements, including the grandstands, club house, and office building, were not wrecked because the cost of wrecking would exceed the value of the salvage at that time. From 1937 until about July 17, 1942, the premises were rented to a group of horsemen for training purposes.

In 1942 the War Department sought to lease the Arlington Downs property for use as a motor vehicle storage pool. The petitioners declined to lease the property to the War Department because of their belief that other properties which were available were more suitable to the purpose and could be more economically operated. War Department representatives, however, insisted on obtaining the use of this particular property and threatened to institute condemnation proceedings to obtain it. Moved by the threat of condemnation and by the desire to avoid any appearance of unwillingness to cooperate with the war effort, the petitioners entered into a lease agreement with the United States on July 17, 1942. The agreement provided in part as follows:

2. The Lessor hereby leases to the Government the following described premises, viz:

Tract #1. Consisting of 68 acres * * *; and

Tract #2. Consisting of 1.6 acres * * *; Together with the improvements now on said land, consisting of a railroad switch tract, fencing, concrete work and buildings, which are designated as the main grandstand, paddocks, small grandstand, club house, and secretary's office.

\* \* \* \* \* \* \*

3. TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning August 1, 1942 and ending with June 30, 1943.

4. The Government shall not assign this lease in any event, and shall not sublet the demised premises except to a desirable tenant, and for a similar purpose, and will not permit the use of said premises by anyone other than the Government, such sublessee, and the agents and servants of the Government, or of such sublessee.

5. This lease may, at the option of the Government, be renewed from year to year at a rental of Seven Thousand Five Hundred ($7,500.00) Dollars per annum, and otherwise upon the terms and conditions herein specified, provided notice be given in writing to the Lessor at least thirty days before this lease or any renewal thereof would otherwise expire: Provided that no renewal thereof shall extend the period of occupancy of the premises beyond the duration of the war and six months thereafter.

\* \* \* \* \* \* \*

8. The Government shall have the right during the existence of this lease to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to other tenants on the property or in the building in which said premises are located; provided further that no alterations or additions shall be made in or to

the buildings or structures now located on said leased premises without having first secured the approval of the lessor or its agent in writing) which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises (which term shall be construed to include the buildings, grounds, fences and all appurtenances to said leased premises in their entirety;) to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted; Provided, however, that if the Lessor requires such restoration, the Lessor shall give written notice thereof to the Government 30 days before the termination of the lease.

*     *     *     *     *     *     *

12. (a) The Government is hereby granted the right to cancel this lease, or any renewal thereof, by giving lessor thirty days notice in writing.

The lease was terminated November 4, 1943, after proper notice by the United States. During the occupancy of the premises by the lessee improvements thereon, with respect to which the petitioners had a basis for gain or loss of $3,675, were damaged, destroyed, or converted. The petitioners promptly advised the lessee of the restoration requirement under the lease agreement, and on November 3, 1943, a settlement agreement was reached, providing in part as follows:

THIS SUPPLEMENTAL AGREEMENT, made and entered into this 3rd day of November, 1943, by and between the THREE D'S STOCK FARM, a partnership composed of E. P. Waggoner and G. L. Waggoner, * * * and THE UNITED STATES OF AMERICA, hereinafter called the Government;

WITNESSETH, that:

WHEREAS, the Lessor and the Government entered into a lease dated July 17, 1942, covering the following described premises: *Tract No. 1:* * * *; and *Tract No. 2:* * * *; Together with the improvements now on said land, consisting of a railroad switch tract, fencing concrete work and buildings, which are designated as the main grandstand, paddocks, small grandstand, club house and Secretary's office, and identified as Lease No. W 781 eng-273 hereinafter referred to as the Original Lease; and,

WHEREAS, said lease will be terminated on the 4th day of November, 1943; and,

WHEREAS, the Lessor has given notice that restoration of the premises by the Government in accordance with paragraph 8 of said Original Lease will be required; and,

WHEREAS, it has been determined that the cost to the Government of restoring said premises will amount to Twenty-two Thousand Four Hundred Forty-two Dollars and Fifty Cents ($22,442.50); and,

WHEREAS, the Lessor has agreed to the acceptance of the sum of Twenty-two Thousand Four Hundred Forty-two Dollars and Fifty Cents ($22,442.50) to be paid in lieu of the restoration of said premises; and,

WHEREAS, it is in the interest of the Government to pay the Lessor said sum in lieu of restoring said premises;

NOW THEREFORE, in consideration of the premises, the parties hereto do mutually agree as follows:

(1) That the Government shall pay to the Lessor the sum of Twenty-two Thousand Four Hundred Forty-two Dollars and Fifty Cents ($22,442.50), representing the amount to be paid the Lessor in lieu of the restoration of the premises by the Government.

(2) That the Lessor hereby remises, releases and forever discharges the Government, its officers, agents, and employees, of and from any and all manner of actions, liability, and claims against the Government, its officers and agents, which the Lessor now has or ever will have for the restoration of said premises or by reason of any other matter, cause or thing whatsoever particularly arising out of said lease and the occupation by the Government of the aforesaid premises.

The sum of $22,442.50 was paid to the petitioners in 1944. No part of the payment was paid as rental for the use or occupancy of the leased premises.

The books and records of the partnership, Three D's Stock Farm, are kept on the accrual basis for a fiscal year ending November 30. In the partnership tax return filed for the fiscal year ended November 30, 1944, a capital gain of $18,767.50 was reported from the receipt of the said $22,442.50 as compensation from the "Involuntary Conversion of property by Lessee (U. S. Army)", having a basis of $3,675. The return for the partnership reported an ordinary net loss of $32,-950.09 and a recognized long term capital gain of $9,446.49 for the fiscal year ended November 30, 1944.

Because petitioners Guy L. Waggoner and E. P. Waggoner were equal partners in Three D's Stock Farm and the distributable share of each in that partnership was community income under the laws of Texas, allocable equally between each partner and his wife, each of the four petitioners reported in his or her individual income tax return for the calendar year 1944 one-fourth of the ordinary loss and one-fourth of the recognized capital gain reported for Three D's Stock Farm for its fiscal year ended November 30, 1944.

Respondent determined that the payment received by the petitioners from the United States did not constitute proceeds from a sale or exchange or involuntary conversion of property but was taxable to them as ordinary income.

The issue to be determined is whether the gain realized by the petitioners upon receipt of compensation from the United States for the damage, destruction or conversion of the petitioners' property while in the possession of the United States is taxable to them as ordinary income or is taxable to them as long term capital gain under section 117 (j), Internal Revenue Code, the pertinent portions of which are as follows:

(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business.—

\* \* \* \* \* \* \*

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph:

\* \* \* \* \* \* \*

(B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

The property here in question was held by the partnership for more than 6 months and was used as rental property to produce income. Undoubtedly, it was of the type of property referred to in section 117 (j) (2) above, and under the plain wording of that section the gain realized by the petitioners upon conversion of the property into money under the lease agreement was long term capital gain if it was realized as the result of an involuntary conversion of the property. Our ultimate question, then, is whether the property was involuntarily converted into money within the meaning of section 117 (j) (2).

It is conceded by the respondent that the property was leased to the United States by the petitioners under threat of condemnation. It is stipulated that:

During the occupancy of the United States, improvements existing on the leased premises with respect to which the partnership had a basis for gain or loss of $3,675.00 were torn down, damaged or converted, including numerous fixtures and appurtenances of one sort or another that were missing and unaccounted for. \* \* \*

Respondent contends, however, that the payment of $22,442.50 which the United States made to the petitioners was made under the supplemental agreement of November 3, 1943, which was entered into voluntarily by the petitioners as the result of negotiations after they received notice of termination of the lease, and that "The effect of the supplemental agreement \* \* \* is to alter, amend or modify the terms of the original lease by eliminating therefrom the restoration clause." In support of this contention he cites *Spencer Thorpe*, 42 B. T. A. 654, dismissed, 121 Fed. (2d) 458. That case was decided before section 117 (j) was added to the Internal Revenue Code. It involved the receipt of compensation by the taxpayer for the default

of a building covenant in a lease. We held that the settlement of the lessor's claim was in no sense a sale or exchange of property and that the payment was ordinary income. No involuntary conversion of property was involved in that case.

Respondent also cites *Hort* v. *Commissioner*, 313 U. S. 28. That case involved the receipt of compensation by the taxpayer for the cancellation of a lease. The Supreme Court held that the payment received was ordinary income because it was merely a substitute for the rent reserved in the lease, not a consideration for the sale or exchange of property. There was no question in the case of any involuntary conversion of property.

*Washington Fireproof Building Co.*, 31 B. T. A. 824, cited by both the petitioners and the respondent, is more similar to the case before us, although it too was decided before section 117 (j) was added to the Code. In that case, the taxpayer received a lump sum payment from a lessee to cover both rent and restoration of the lessor's property. On its books the taxpayer treated part of the sum received as rental, part as miscellaneous income, and part as a reserve for replacements. We held that the entire payment, less the actual amount expended by the taxpayer in making partial restoration of the property, was not rental in its usual and ordinary sense but that the taxpayer failed to prove how much of the sum received was return of capital and how much was income, so that the respondent's determination was approved. Judge Murdock, in a concurring opinion with which seven other judges agreed, characterized the resultant gain to the taxpayer as follows:

> Money was paid to a lessor by a lessee in lieu of replacing substantial parts of a building which the lessee had removed and had agreed to replace. The question is, How much of the money settlement is income to the lessor? The answer to that question does not depend upon what the lessor did with the money nor upon how much money would have been necessary to restore the building. If all or some part of the money might be considered rent that would be all income. If all or any part of the money was not rent but a payment to the lessor for portions of his building, then to that extent the transaction was substantially similar to a sale and must be treated for income tax purposes as a "sale or other disposition" of a portion of his building. * * *

Although there was no question of involuntary conversion in the *Washington Fireproof Building Co.* case, *supra*, and there was no consideration at that time of section 117 (j), we think that the principles stated in that case are applicable here, since the compensation received by the petitioners from the United States was solely for property which was damaged, destroyed or converted while in possession of the United States under a lease entered into by the petitioners under threat of condemnation, and no part of it was either rent or consideration for the termination of the lease. The

facts here are that the petitioners owned property in 1942 which they, as above stated, leased to the United States with the provision that the United States would restore the property when it terminated the lease. Rather than make actual restoration of the property, the United States agreed with the petitioners to pay them cash equal to the estimated cost of restoration. The fact that the petitioners voluntarily agreed to accept compensation for the property in lieu of actual restoration did not alter the character of the lease agreement. The supplemental agreement merely substituted one obligation for another; that is, it made restitution to the petitioners for their property in cash instead of in property. The supplemental agreement must be treated as a part of the lease agreement as a whole and not as a separate transaction. When so considered, it must follow, we think, that the petitioners' property which was damaged, destroyed, or converted while in the possession of the United States under the lease of July 17, 1942, was involuntarily converted into money, within the meaning of section 117 (j) (2), Internal Revenue Code.

We conclude that the gain realized by the petitioners from the payment in question is taxable to them as long term capital gain and that respondent erred in his determination that it should be taxed to them as ordinary income.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*