MIDWEST MOTOR EXPRESS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54589. Filed October 31, 1956.

*Joseph A. Maun, Esq.*, for the petitioner.
*Merl B. Peek, Esq.*, for the respondent.

### OPINION.

BRUCE, *Judge:* Respondent determined a deficiency in petitioner's income and excess profits taxes for the year 1952 in the amount of $25,770.51. In an answer to amendments to petition, filed May 20, 1955, respondent claimed an increase in deficiency from the above amount to $30,246.73. Certain adjustments made by respondent in his determination of the deficiency have not been contested. Also, several issues presented by the pleadings have been settled by stipulation of the parties or conceded on brief. Adjustments therefor will be made in a computation under Rule 50. The remaining issues presented for our determination relate to the treatment to be accorded an award by the Motor Carrier Claims Commission and a retrospective premium for public liability insurance paid by petitioner. They are:

1. Whether the sum of $29,324.74 received by petitioner in 1952 as the result of an award by the Motor Carrier Claims Commission is taxable to petitioner in 1952 or was accruable prior thereto.

2. If taxable in 1952, is said sum taxable as capital gain under the provisions of section 117 (j) of the Internal Revenue Code of 1939, or as ordinary income under section 22 (a) of the Internal Revenue Code of 1939?

3. Whether a retrospective public liability insurance premium in the amount of $5,200.94 paid in 1953 was properly accrued by petitioner as a business expense for 1952, or was accruable prior thereto.

All of the facts were stipulated and are so found and incorporated herein by this reference.

Petitioner is a corporation organized under the laws of North Dakota with its principal office located at Bismarck, North Dakota. For the taxable year 1952 petitioner filed its income tax return with the director of internal revenue for the district of North Dakota. An amended return for the same year was filed in 1953. For 1952 and prior years petitioner filed its Federal income tax returns for a calendar year period and on an accrual basis.

Since its inception in 1938 petitioner has been engaged in business as a common carrier of property by motor vehicle, operating its vehicles in various midwestern States. At all pertinent times petitioner was a motor carrier operating in interstate commerce under the jurisdiction of the Interstate Commerce Commission.

Prior to August 11, 1944, petitioner owned and operated motor tractors, trucks, semitrailers, pick-up and delivery trucks, and service cars. Petitioner also owned certain real estate used as a terminal in the operation of its business and miscellaneous personal property, all used in its business. All of this property was acquired prior to January 1, 1944.

From September 15, 1939, to August 11, 1944, petitioner and other motor carriers in the midwest were operating under substantially similar contracts with a drivers' union. In 1943 a group of midwestern carriers, including petitioner, sought to negotiate a separate contract with the union. Negotiations became deadlocked, however, and the matter was certified to the National War Labor Board, which decided that wage rates should be increased. Because it could not afford the wage increase, petitioner continued to operate under the old contract until August 4, 1944, when the drivers went out on strike. On August 11, 1944, all of petitioner's operations were shut down.

On August 11, 1944, the President of the United States signed and issued Executive Order No. 9462, which provided:

Executive Order No. 9462

Possession and Operation of Certain Motor Carrier Transportation Systems

Whereas, after investigation I find and proclaim that the motor carrier transportation systems of the motor carriers named in the list attached hereto and made a part hereof are equipped for the transportation of materials of war and supplies that are required for the war effort, or useful in connection therewith, and are now engaged in such transportation; that there are threatened interruptions of the operation of said transportation systems as a result of a labor disturbance; that the war effort will be unduly impeded or delayed by such interruptions; that it has become necessary in the national defense to take possession and assume control of the said transportation systems for needful and desirable purposes connected with the prosecution of the war and that they be operated by or for the United States; and that the exercise as hereinafter speci-

fied, of the powers vested in me is necessary to insure, in the interest of the war effort, the operation of said systems;

Now THEREFORE, by virtue of the power and authority vested in me by the Constitution and laws of the United States, including the Act of August 29, 1916, 39 Stat. 645, the First War Powers Act, 1941, and Section 9 of the Selective Training and Service Act of 1940 as amended by the War Labor Disputes Act, as President of the United States and Commander in Chief of the Army and Navy, it is hereby ordered as follows:

1. The Director of the Office of Defense Transportation is authorized and directed, through or with the aid of any public officers, Federal Agencies, or other Government instrumentalities, that he may designate, to take possession and assume control of, and to operate, or arrange for the operation of, the motor carrier transportation systems of the motor carriers named in the list attached hereto and made a part hereof, including all real and personal property and other assets, wherever situated, used or useful in connection with the operation of such systems, in such manner as he may deem necessary for the successful prosecution of the war; and to do anything that he may deem necessary to carry out the provisions and purposes of this order.

2. Subject to the applicable provisions of existing law, including the orders of the Office of Defense Transportation, issued pursuant to Executive Orders 8989, as amended, 9156 and 9294, the said transportation systems shall be managed and operated under the terms and conditions of employment in effect between the carriers and the collective bargaining agents at the time possession is taken under this order. During his operation of said transportation systems the Director shall observe the terms and conditions of the directive order of the National War Labor Board, dated February 7, 1944; provided, however, that in the case of each said transportation system the Director is authorized to pay the wage increases provided for by the said directive order of the National War Labor Board, which accrued prior to the taking of possession of said system under this order, only out of the net operating revenue of the said system.

3. Except with the prior written consent of the Director, no attachment by mesne process, garnishment, execution, or otherwise shall be levied on or against any of the real or personal property or other assets, tangible, or intangible, in the possession of the Director hereunder.

4. Possession, control, and operation of any transportation system, or any part thereof, or any real or personal property, taken under this order shall be terminated by the Director when he determines that such possession, control, and operation are no longer necessary for the successful prosecution of the war.

5. For the purposes of paragraphs 1 to 4, inclusive, of this order, there are hereby transferred to the Director the functions, powers, and duties vested in the Secretary of War by that part of Section 1 of the said Act of August 29, 1916, reading as follows:

The President, in time of war, is empowered through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war materials and equipment, or for such other purposes connected with the emergency as may be needful or desirable.

6. Upon request of the Director of the Office of Defense Transportation the Secretary of War is authorized to take any action that may be necessary to enable the Director to carry out the provisions and purposes of this order.

THE WHITE HOUSE

/s/ FRANKLIN D. ROOSEVELT

Petitioner was included in the list of carriers named in the order. On the same date, August 11, 1944, the Director of the Office of Defense Transportation, having first notified it by telegram, sent petitioner a "Notice and Order Establishing Federal Possession and Control and Appointing a Federal Manager," which read as follows:

### Notice and Order Establishing Federal Possession and Control and Appointing a Federal Manager

To each of the motor carriers named in an Executive Order of the President of the United States concerning the possession and operation of certain motor carrier transportation systems:

1. You are hereby notified that, by order of the President of the United States (copy of Executive Order attached), possession and control of your motor carrier transportation system, including all real and personal property and other assets, wherever situated, used or useful in connection with the operation of such a system, are hereby taken and assumed by me as Director of the Office of Defense Transportation as of 12:01 A. M. on the twelfth day of August, 1944. Possession and control is not taken of any of your property, facilities, or other assets, which are not used or useful in the operation of your transportation system.

2. The purpose of possession, control and operation of motor carrier transportation systems and properties by the United States pursuant to said Executive Order is to assure the maintenance of an effective system of transportation for the movement of troops, materials of war, and supplies and food for the armed forces and the civilian population.

3. Effective this date, Ellis T. Longenecker is hereby appointed Federal Manager of the motor carrier transportation systems and properties taken hereunder, with full authority, subject to my direction:

(a) To possess, control, and operate, or arrange for the operation of, each of the systems and properties taken hereunder in such manner as may be necessary for the successful prosecution of the war and maintenance of essential civilian economy and to accomplish the purpose of the Executive Order through or with the aid of such public or private agencies, persons, or corporations as he may designate;

(b) Subject to the provisions of the Executive Order, to manage or operate or arrange for the management or operation of, said systems and properties under such terms and conditions of employment as he deems advisable and proper;

(c) From time to time, to return to any of the motor carriers such real or personal property, or other assets of such carrier, as he determines to be unnecessary to the operation of its motor carrier transportation system; and,

(d) To participate in joint action with other carriers pursuant to orders of the Office of Defense Transportation.

4. A copy of this Notice and Order shall be posted by each carrier in the principal place of business or headquarters of its transportation system and in each terminal maintained in connection with its operation.

Issued at Washington, D. C., this Eleventh Day of August, 1944.

/s/ J. M. JOHNSON
*Director of the Office of Defense Transportation*

Ellis T. Longenecker, the appointed Federal Manager of motor carrier transportation systems and properties, assumed his duties on August 11, 1944, and issued an order which provided, *inter alia:*

1. Until further order, you are hereby directed to resume or continue the operation of your motor carrier transportation system in the usual and ordinary manner and course of business, as a going enterprise, in your present corporate, partnership, individual, or trade name, as the case may be, and by means of the instrumentalities, agents, officers, and employees customarily employed by you, as fully as if possession and control had not been taken and assumed by the United States, subject, however, to the terms of said Executive Order and to all general and special orders, rules, regulations, and directions, which may be issued thereunder. Title to the properties and other assets of which possession has been taken remains in the owners thereof. Possession by the United States is not exclusive, and the United States asserts, and will assert, only such control over the properties in its limited possession as may be necessary to accomplish the purposes of operation and of said Executive Order.

On August 12 and 13, 1944, a meeting was held between the midwest motor carrier operators, including petitioner, and representatives of the United States Government. The motor carriers were urged to resume their operations and to utilize their present personnel insofar as possible. They were advised that if the owners of the motor carrier properties did not see fit to operate them, the Federal Manager would place his own representatives on the properties. The carriers agreed to resume operations subject to their right to file written protests and objections to the provisions of the Federal Manager's order.

Within the time allowed for filing protest, petitioner filed with the Federal Manager a document in which it agreed to resume operations, but sought to reserve its right to any compensation to which it might be entitled and specifically protested the assumption by it of sole responsibility for loss or damage arising out of any action it might be required to take.

During the period August 12, 1944, to the date of termination of control the Federal Manager maintained supervision and ultimate control over the operations of petitioner's transportation system. Members of the Federal Manager's staff made calls at petitioner's offices to observe petitioner's compliance with the orders and directives of the Federal Manager, and to submit suggestions and recommendations. Petitioner received orders and notices fixing the amount of wages to be paid employees, prescribing certain accounting methods and procedures, ordering the publication of a new minimum charge rule, and in general regulating the operations of petitioner's motor carrier transportation system.

Possession and control of petitioner's transportation system and property by the United States was terminated on September 28, 1945.

Immediately after petitioner was released from Federal control, efforts previously commenced to obtain just compensation were continued. Conferences with representatives of the Office of Defense Transportation resulted in a denial of liability by that office. Subsequently, identical private relief bills were introduced in the Senate and House of Representatives to provide for settlement of claims for damages to the motor carriers' transportation systems, and to provide for just compensation for the use of the systems during Federal possession and control. The Senate bill originally provided that each qualified motor carrier, upon compliance with certain conditions, was to receive compensation for use of its properties and for damages sustained in an amount to be determined by the Interstate Commerce Commission in accord with a formula contained in the Act. The bill was amended, however, to provide for a Motor Carrier Claims Commission to hear and determine all such claims. The House Committee on the Judiciary, which considered the amended bill, stated in its report (H. Rept. No. 2182, 80th Cong., 2d Sess.) :

THE PROBLEM

Two questions are presented. First, was there a "taking" of the properties in the legal sense requiring payment of just compensation to the owners under the fifth amendment to the Constitution? Second, if there was a "taking," what is the proper measure of damages? Certain suits are now pending in the Court of Claims brought by some of the affected carriers, and the principal issues presented parallel those stated. The Government contends that legislation is unnecessary and that the decision in one case will settle the issue of "taking" for all cases and will clarify the measure of damages so as to reduce the problem to one of accounting in all similar cases. The carriers contend this is not so, that each case must rest on its own particular facts, and that what may be true in one case would not necessarily apply in another. They contend that 103 separate actions in the Court of Claims would so congest the docket of that court as to unduly prolong relief and add to the financial dilemma now confronting the claimants.

THE SOLUTION

The committee feels that a blanket endorsement of a "taking" in the legal sense cannot be made upon its present knowledge of the facts concerning each separate carrier. Therefore, it appears that a logical solution would be, as proposed in the reported bill, for a Motor Carrier Claims Commission to be established to hear and determine these matters. It has been the frequent experience of Congress in the past to create such quasi tribunals for the purpose of disposing of a large number of claims of similar nature all arising from some activity of the Government, and it has been found that often such commissions are able to provide speedy and equitable remedies more efficaciously than those provided through normal channels. The reported bill accordingly establishes a commission, describes its constitution, duration, and mechanics of operation, authorizes it to promulgate regulations, prescribes a period of limitations for acceptance of claims, provides a method for review of orders, requires reports to Congress, and leaves to its discretion the formulation of measures of damages which will be consistent with the rights and equities of all parties concerned.

A Motor Carrier Claims Commission was established pursuant to Act of Congress of July 2, 1948 (62 Stat. 1222). Pertinent sections of the Act provide:

Sec. 2. The Commission shall hear and determine, according to law, existing claims against the United States arising out of the taking by the United States of possession or control of any of the motor-carrier transportation sysems described in Executive Order Numbered 9462, dated August 11, 1944 (C. F. R., 1944 Supp., p. 70). The settlement of any claim prior to the enactment of this Act shall not prevent the Commission from hearing and determining such claim if it determines that the principles of equity as administered by the courts require that such settlement be set aside and that such claim be heard and determined.

    \*        \*        \*        \*        \*        \*        \*

Sec. 6. The Commission shall receive claims for a period of six months after the date of enactment of this Act, and not thereafter. The jurisdiction of the Commission over claims presented to it as provided in section 2 of this Act shall be exclusive; but nothing in this Act shall prevent any person who does not elect to present his claim to the Commission from pursuing any other remedy available to him. The Attorney General or his assistants shall represent the United States in all claims presented to the Commission.

    \*        \*        \*        \*        \*        \*        \*

Sec. 8. The final determination of the Commission shall be in writing, shall be filed with its clerk, and shall include (1) its findings of the facts upon which its conclusions are based; (2) a statement (a) whether there are any just grounds for relief of the claimant and, if so, the amount thereof; (b) whether there are any allowable offsets, counterclaims, or other deductions, and, if so, the amount thereof; and (3) a statement of its reasons for its findings and conclusions.

Sec. 9. (a) When the final determination of the Commission has been filed with the clerk of said Commission the clerk shall give notice of the filing of such determination to the parties to the proceeding in manner and form as directed by the Commission. Such determination shall be subject to review in the same manner as is provided for cases in the Court of Claims upon application to the Supreme Court within three months from the date of the filing of such determination with the clerk.

Sec. 10. In each claim, after the proceedings have been finally concluded, the Commission shall promptly submit its report to Congress.

The report to Congress shall contain (1) the final determination of the Commission; (2) a transcript of the proceedings or judgment upon review, if any, with the instructions of the Supreme Court; and (3) a statement of how each Commissioner voted upon the final determination of the claim.

Sec. 11. (a) When the report of the Commission determining any claimant to be entitled to recover has been filed with Congress, such report shall have the effect of, and be paid in the same manner as is provided for, a final judgment of the Court of Claims.

The payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.

(b) A final determination against a claimant made and reported in accordance with this Act shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy.

On March 27, 1950, petitioner filed a claim for $196,019.49 with the Motor Carrier Claims Commission in which demand was made for the payment of just compensation for the taking and use of its properties by the United States. Petitioner computed the amount due on the basis of a reasonable rental value of its properties during the period of Federal control.

The first case presented to the Motor Carrier Claims Commission was known as R–B Freight Lines, Inc. There was an understanding between representatives of the carriers and personnel of the United States Department of Justice that both litigants would use their best efforts to make a full and complete record in the case and that thereafter the decision in the R–B Freight Lines case would establish the pattern for disposition of the cases to follow.

The Commission promulgated its decision in the R–B Freight Lines case on April 28, 1951, and the decision was favorable to the motor carrier. Petition for writ of certiorari, acquiesced in by counsel for the R–B Freight Lines, was filed in the Supreme Court of the United States on December 19, 1951, and was denied on February 4, 1952.

The understanding between the carriers and personnel of the Department of Justice was not followed because the Department of Justice desired to present to the Commission new evidence bearing upon matters considered unimportant prior to the R–B Freight Lines decision and because the Government desired to further express arguments previously advanced. At the time of this decision there had been a change in policy-determining personnel in the Department of Justice because of the death of Colonel Edward Fell with whom the understanding had been reached. It appeared that there would be substantial delays in processing all of the remaining cases to a final determination as long as the Government reserved its right to process each case separately and use up the full appeal period. Therefore in 1952, the carriers, including petitioner, authorized their counsel to agree to a stipulation with the Department of Justice under which the measure of compensation determined under the R–B Freight Lines principles would be reduced. Such a stipulation was entered into in each case and filed with the Motor Carrier Claims Commission.

On May 19, 1952, the Commission handed down its findings of fact, conclusions of law, and memorandum relative to the claim previously filed by petitioner. The Commission reached the following conclusions:

### II. What Was Taken

In our opinion the Executive Order and the Notice and Order of Possession and Control leave no room for doubt as to what the Government took. Both documents call for the taking of possession and assumption of control of petitioner's motor carrier transportation system, "including all real and personal property and other assets, wherever situated, used or useful in connection with

the operation of such system." The telegram reads, "* * * and all property. * * *"

We therefore conclude that as of 12:01 A. M., August 12, 1944, the Government took possession and control of all of petitioner's property, including each and every item used or useful in connection with the operation of its transportation system.

The fact that the Government chose to use petitioner's property in the same business as was previously conducted by petitioner does not in any way alter the effect of the act of taking. If the Government had decided to close petitioner's offices and place its vehicles in storage, there would have been no less of a taking, nor would the petitioner's right to compensation have been impaired or diminished. We are concerned with what petitioner was deprived of. We find that petitioner was deprived of its property and of the right to determine what use should be made of it. We cannot presume from the Government's use of the property that petitioner could only have carried on the same business.

### III. Compensation

To fix the "just compensation" to which petitioner is entitled for the taking of its properties, we undertake to determine the value of the property on the date of the taking, August 11, 1944. This is to be determined as the fair market value, based not upon what the Government gained by the taking and use of the property, but rather upon what the petitioner lost in this property. United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53; Boston Chamber of Commerce v. City of Boston, 217 U. S. 189.

A. Rental.

In a case of taking for temporary use the normal measure of just compensation is the fair rental value of the property so taken and used. United States v. General Motors Corporation, supra [323 U. S. 373]; United States v. Petty Motor Co., 327 U. S. 372; Kimball Laundry Co. v. United States, 338 U. S. 1.

We find no reason to depart from the rental measure in this case. As pointed out above, petitioner was deprived of its property and the right to determine the use to which it should be put. Consideration should be given to uses to which property is adaptable and can reasonably be expected to be needed. Mississippi and Rum River Boom Co. v. Patterson, 98 U. S. 403. Unquestionably, one use which was available to petitioner was to rent out its property; there was a demand, and the property was suitable for this use. The right and opportunity to devote the property to such use were taken away; thus the rental value represents petitioner's pecuniary loss.

The market price of the property taken is just compensation. The market value in the case of the taking of the fee is the sum which probably would be arrived at as a result of fair negotiations by an owner willing to sell and a purchaser willing to buy, after due consideration of all elements reasonably affecting value, Olson v. United States, 292 U. S. 246. As applied to the taking of temporary use of property, the market value is the sum which probably would be arrived at in the same manner by a willing lessor and a willing lessee, Kimball Laundry Co. v. United States, supra.

We are satisfied that, at the time of the seizure of petitioner's property, there existed a demand and a rental market for all of petitioner's property listed in the findings. Market net rental rates for the various items of petitioner's property have been agreed on by the parties and the findings on rental values are mere mathematical computations. The rental rates agreed on are somewhat lower than rates which have been determined by the Commission in other cases on the same evidence. While the agreed rental rates are contained

in a document entitled a "Stipulation for Settlement" which was filed by petitioner and respondent, the evidence in the case is ample to support all of the findings hereinbefore appearing; and we find it necessary to give effect to the "Stipulation for Settlement" only to the extent that it constitutes a waiver by the petitioner of any claim for any amounts of compensation in excess of the amounts indicated by the stipulation.

B. Other Compensation or Credits.

During the Government's possession and control of petitioner's property, the operation of the business and system was the Government's own operation. The Government was therefore entitled to any profits derived therefrom, and should bear any losses sustained. In cases in which there was a loss, it was borne out of the petitioner's assets, and constituted a complete taking and consumption of such assets to the extent of the loss. In cases in which there was a profit, this profit was contained somewhere in the returned properties and the returned properties were thus augmented by the amount of the profit. The result is that petitioner is to be awarded compensation in the amount of the loss in the one case, and the Government is to be credited with the amount of profit in the other.

In some cases, the Government advanced funds for operations. In such cases, if the amount of the advance has not been repaid, the Government is to be allowed a credit in such amount.

In each case, the amount of additional compensation, or the amount of credit, is determined on the evidence in the case.

C. Interest.

An additional sum is computed in the manner of interest, not to be paid as interest, but as a part of the total compensation which would repay petitioner for its loss in the property taken. This additional sum is to make the total allowed compensate petitioner as fully as though payment had not been deferred. Phelps v. United States, 274 U. S. 341.

While the Supreme Court approved the disallowance of interest in the case of United States v. North American Trading Co., 253 U. S. 330, it appears that the distinction there made was not based entirely on the plaintiff's delay in filing suit but also in the difference between the manner of taking in that case and in others. We have found no case in which a reversal was based upon allowance of interest by the lower court.

The taking on August 11, 1944 was of the use of petitioner's property and the value of said use is computed as rental. The amount of such rental did not become fixed until there could be a determination of the length of the period of use. The compensation due for such use was not only undetermined but incapable of determination until the end of the period. Therefore, the additional sum computed in the manner of interest will be calculated from the date of termination of possession and control.

Since the sole object is to compensate petitioner, the rate adopted is 4 per cent per annum, which is consistent with prevailing rates of interest during recent years. Arkansas Valley Railway v. United States, 107 Ct. Cl. 240.

The Commission determined that the United States was indebted to petitioner in the amount of $44,054.34 which was an amount based on the market net rental value of petitioner's properties during the period in question; and that as against this amount, the United States was entitled to a credit of $21,012.57. The Commission found that

petitioner was entitled to a total amount of $23,041.77, plus a sum equivalent to interest thereon at 4 per cent per annum from September 28, 1945, to date of payment, which sum was found to be a part of just compensation. Neither petitioner nor the United States appealed from the decision of the Commission with respect to petitioner's claim.

Petitioner received $29,324.74 from the United States during the year 1952, based upon the award determined by the Motor Carrier Claims Commission. In its income tax return for the calendar year 1952, petitioner disclosed the facts surrounding the receipt of the award, but did not include any part of the award as taxable income. No entry of the award in any amount was made by petitioner on its books and records prior to the year 1952.

In his determination of the deficiency involved herein, respondent determined that the entire amount of the award received by petitioner from the United States was taxable income in the year 1952.

During the year 1952 petitioner paid $5,384.78 to certain attorneys for their services in connection with the hearings before the Motor Carrier Claims Commission as a result of which the award was made.[1] This was an ordinary and necessary expense.

During the year 1948 petitioner was insured under a comprehensive general automobile liability policy by the Fidelity and Casualty Company of New York. Petitioner canceled the policy on December 2, 1948. The amount of premium under the policy was determined on a retrospective rating basis as set forth in the following provisions:

*DEFINITIONS*

2. STANDARD PREMIUM: The premium for commercial automobiles owned by or rented to the Insured computed in accordance with the provisions of the policy, other than this endorsement, and in accordance with any applicable experience or schedule rating plan.

3. FIXED CHARGE: The Fixed Charge is the Standard Premium multiplied by the factor *.357*.

4. MINIMUM RETROSPECTIVE PREMIUM: The minimum Retrospective Premium is the Standard Premium multiplied by the factor *.50*.

5. MAXIMUM RETROSPECTIVE PREMIUM: The Maximum Retrospective Premium is the Standard Premium multiplied by the factor *1.50*.

6. INCURRED LOSSES: The term "Incurred Losses" as used in this Plan shall mean the sum of actual paid losses, allocated loss expense, and the reserves, as estimated by the COMPANY for unpaid losses outstanding at the time of any adjustment provided herein. The word "Losses" as used herein means only such losses arising out of the ownership, maintenance or use of commercial automobiles owned by or rented to the Insured.

---

[1] The parties have stipulated: "That the amount of $29,324.74 is income arising out of a claim and/or award as a result of the determination of the Motor Carrier Claims Commission within the meaning of section 456 (a) (2) (A) of the Internal Revenue Code of 1939 and that the net expenses applicable to such amount are $5,384.77, resulting in net abnormal income in the amount of $23,939.97 for the taxable year 1952."

*7. DETERMINATION OF TOTAL RETROSPECTIVE PREMIUM:*

The Total Retrospective Premium is—

(a) .357 of the Standard Premium

plus

(b) The sum represented by incurred losses multiplied by the factor *1.16*, but the said Total Retrospective Premium shall not be less than the Minimum Retrospective Premium nor greater than the Maximum Retrospective Premium.

8. COMPUTATON OF TOTAL RETROSPECTIVE PREMIUM: The COMPANY shall make three computations of the total Retrospective Premium, as follows:

The first, between six and eight months after termination of the policy.

The second, between eighteen and twenty months after termination of the policy.

The third, between thirty and thirty-two months after termination of the policy.

In making such computations, incurred losses shall be valued respectively as of dates six months, eighteen months, and thirty months after termination of the policy.

The Total Retrospective Premium determined by the third computation shall be the final retrospective premium unless the INSURED and the COMPANY are not in agreement as to the amount of reserves carried on any unpaid losses outstanding at that time, in which event, the final computation of the total retrospective premium shall be deferred until such time as the total liability of the COMPANY for payments as respects any unpaid losses outstanding shall be definitely determined, or there shall be agreement between the INSURED and the COMPANY as to the amount of reserves for any unpaid losses outstanding, to be included in such final computation.

In no event, however, is the final computation of the total retrospective premium to be deferred beyond a period of five years after the termination of the policy. In the event that the INSURED and the COMPANY are not in agreement as to the amount of reserves to be carried on any unpaid losses outstanding at that time, the matter shall be referred for arbitration to a committee of three, one member of which shall be selected by the INSURED, one by the COMPANY, and the third, by those two members. The decision of this committee shall be final, and the final computation of the total retrospective premium shall then be made, based upon the decision of any two of this committee.

*9. PAYMENT OF PREMIUM:*

(a) STANDARD PREMIUM: Upon the inception date of this policy the INSURED shall pay to the COMPANY the Standard Premium.

(b) RETROSPECTIVE PREMIUM: After the COMPANY has made the first computation of the total retrospective premium, the INSURED shall immediately pay to the COMPANY the difference between the total retrospective premium and the premium previously paid to the COMPANY, if the total retrospective premium is greater than the premium previously paid. The COMPANY shall return to the INSURED the difference between the total retrospective premium and the premium previously paid to the COMPANY, if the total retrospective premium is less than the premium previously paid.

Corresponding adjustments shall be made at the time of the second and third, and any subsequent computation of the total retrospective premium.

*10. CANCELLATION*

(a) CANCELLATION BY THE INSURED: In the event of cancellation of the policy by the INSURED:

(1) The standard premium for the period that the policy was in force is to be computed at short rates in accordance with the short rate provisions of the policy.

(2) The Standard Premium so computed shall be the minimum retrospective premium.

(3) The Maximum Retrospective Premium shall be determined by multiplying the factor 1.50, the Standard Premium for the period of a full year, obtained by extending on a pro rata basis, the actual Standard Premium for the time the policy was in force.

While the policy was in force in 1948, as a result of an accident involving one of petitioner's trucks, a claim for damages was made by one Emery. In 1950 the Fidelity and Casualty Company of New York set up a reserve of $25,000 to cover the Emery lawsuit. In June 1950 petitioner received notice of additional premium due in the following letter:

THE FIDELITY AND CASUALTY COMPANY OF NEW YORK

*June 15, 1950*

MIDWEST MOTOR EXPRESS, INC.
1205 FRONT STREET
BISMARCK, NORTH DAKOTA

GENTLEMEN:

Our Company has set up a reserve of $25,000. on the Emery lawsuit and have computed the retrospective settlement for the period April 15th to the date of cancellation, December 2, 1948.

Inasmuch as the maximum premium which you can be required to pay is 1-½ times the amount which has already been billed to you, it would not make any difference whether their reserve was $15,000, or more, you would still be subject to the maximum premium. They have, therefore, instructed us to make settlement with you on the basis of the maximum premium, and if subsequent events should show that the amount paid on this is less, you will be entitled to a refund. We, therefore, enclose a statement of your account as it appears on our books. You doubtless already have detail of the $254.64 item. Detail of the $51.62 item is on the statement of adjusted premium, and is the result of Mr. Rosenbach's audit. The retrospective premium adjustment is shown on the final sheet.

We will appreciate it very much if you will make arrangements to settle this at the earliest possible moment.

Very truly yours,

/s/ H. GLENN SAYLER
*Treasurer*

HGS:wd
Encl.

The amount of additional premium due from petitioner as a result of the retrospective rating provisions of the policy was $5,200.94.[2] After unsuccessfully attempting to adjust the amount of the additional premium, petitioner paid the full sum in 1953.

The lawsuit brought by Emery against petitioner was settled during the year 1952. The total cost of the settlement, including incidental expenses in connection with the lawsuit, was $17,458.84.

---

[2] The stipulation states this sum to be "5507.20 as appears by the statement * * * attached * * *." The statement (Exhibit 5–E) includes as a part of the total figure of 5507.20 the item "Additional premium a/c Retrospective—5200.94."

In its original income tax return for the calendar year 1952 petitioner did not claim as a deduction the amount of $5,200.94 for the additional premium due under its automobile insurance policy because of the retrospective premium provision. However, on June 13, 1953, petitioner filed an amended return for 1952 in which it claimed this amount as a deduction. In its amended petition, petitioner assigns as error the Commissioner's failure to allow this deduction.

Respondent has determined that the amount of the award rendered by the Motor Carrier Claims Commission is accruable as income in the year 1952 when the decision was handed down and the award was actually received. Petitioner contends that the award was accruable prior to the year of actual receipt because its right to such award and the determination of the amount had previously become fixed and ascertainable.

Petitioner filed its income tax returns for the years in question on an accrual basis. In *Dingle-Clark Co.*, 26 T. C. 782, with respect to the time of accruability of income items, we stated:

Such method contemplates the inclusion of an item in gross income when all events have occurred to fix the amount due and determine the liability to pay. *Spring City Foundry Co. v. Commissioner*, 292 U. S. 182. An item may be accrued, if there is legal liability, even though the amount is not definitely fixed, if all the events have occurred by which the amount may be determined with reasonable certainty. *Continental Tie & Lumber Co. v. United States*, 286 U. S. 290; *Lehigh Valley Railroad Co.*, 12 T. C. 977. It is the right to receive and not the actual receipt that is determinative. However, where this right depends upon a contingency or further events the item may not be accrued until the contingency or events have occurred and fixed with reasonable certainty the fact and amount of the sum involved. *United States v. Safety Car Heating & Lighting Co.*, 297 U. S. 88; *Lucas v. American Code Co.*, 280 U. S. 445; *Globe Corporaation*, 20 T. C. 299; *Boston Elevated Ry. Co.*, 16 T. C. 1084, affirmed without discussion of this point 196 F. 2d 923; *Henry Hess Co.*, 16 T. C. 1363, reversed on other grounds 210 F. 2d 553.

We do not think that petitioner's right to receive the award, or the amount thereof, was fixed with reasonable certainty at any time prior to 1952. After Federal control had ceased, petitioner unsuccessfully sought compensation from the Office of Defense Transportation. Thereafter, relief legislation was introduced in both houses of Congress, and in 1948 an Act establishing the Motor Carrier Claims Commission was passed. It is to be noted that in considering this legislation the House Committee on the Judiciary stated that the purpose of the Act was to establish a commission to determine whether there had been a taking of the motor carriers' property within the meaning of the Fifth Amendment and, if so, to ascertain the proper measure of just compensation to be afforded each aggrieved carrier. H. Rept. No. 2182, *supra*. Nowhere does the Act setting up the Commission purport to create in any motor carrier a right to compensation.

On the contrary, complete authority to determine such claims was given to the Commission, including the express power to determine whether there were just grounds for relief and, if so, the amount necessary to compensate the claimant. Any right to receive compensation from the Government was made to depend upon the determination of the Commission. Accordingly, we hold that the award in question did not accrue to petitioner until the decision of the Commission settling *petitioner's* claim was handed down in 1952, for it was not until then that the right to receive compensation and the amount thereof became fixed with reasonable certainty. *H. Liebes & Co.*, 34 B. T. A. 677, affd. 90 F. 2d 932; *Lehigh Valley Railroad Co.*, 12 T. C. 977.

Petitioner argues that its right to receive the award was fixed as of the time of the taking in 1944, citing *Commissioner* v. *Old Dominion S. S. Co.*, 47 F. 2d 148; and *Commissioner* v. *Midland Valley R. Co.*, 57 F. 2d 1042. Those cases, however, involved the Federal Control Act of 1918, which fixed the right of certain railroads to awards payable from time to time in reasonable installments for each year of Federal control. The Act under consideration here does not purport to provide for annual payments to the motor carriers; in fact, the statute impliedly denies the liability of the Government until the Commission has determined that grounds for relief exist. Clearly, petitioner had no right to compensation which was accruable in 1944.

Nor do we agree with petitioner that the right became certain as of the time Congress passed the Act setting up the Motor Carrier Claims Commission in 1948. *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290; and *Automobile Insurance Co. of Hartford* v. *Commissioner*, 72 F. 2d 265, reversing orders of the Board of Tax Appeals, cited in support of this argument, are distinguishable. In the *Continental Tie* case the statute involved was the Transportation Act of 1920 which fixed the *right* to compensation and provided a *formula* by which the amounts due could be computed by the Interstate Commerce Commission. The *Automobile Insurance Co.* decision dealt with the Settlement of War Claims Act of 1928 which set up a fund out of which war claims were to be paid. Under those Acts, the right to the award became fixed upon the passage of the Act, for the terms of both statutes admitted liability and the amounts were reasonably ascertainable. Those situations are quite different from the one at hand. The Act passed by Congress in 1948 did not create in any carrier a right to an award. Furthermore, the statute contained neither a formula by which amounts due could be computed, nor a fund out of which claims by the motor carriers could be paid. The legislative history of the bill shows that Congress expressly rejected the original draft which created a right to compensation in every carrier meeting certain requirements and provided a formula to be applied in de-

termining the amount of compensation. Since the Act as passed provided for a Commission to determine whether a right to compensation existed and the amount thereof, it is clear that petitioner's right to the award did not accrue in 1948.

We also find no merit in petitioner's assertion that the right to receive the award became fixed and unconditional in 1951 when the Commission's decision in the R–B Freight Lines case was promulgated. The stipulation of facts shows only that there was an "understanding" between the carriers and certain personnel of the Department of Justice that both parties would attempt to make a complete record in the R–B Freight Lines case and that the decision in that case would establish a *pattern* for the disposition of the cases to follow. There is nothing in the record herein to indicate that this so-called understanding was ever reduced to writing and filed with the Commission as a part of the proceedings with respect to any of the claims pending before it. Nor is there anything in the record to indicate that any of the parties, carriers or the Government, intended to preclude themselves from having each claim presented to and determined by the Commission. In fact it will be observed from section 10 of the Act establishing the Commission that the Commission was required to make a report to Congress in each claim. Moreover, there is no showing as to the authority of the personnel of the Department of Justice with whom such understanding was had to enter into a contract which, under the circumstances, would have been binding upon the Government with respect to each and every claim. Those dealing with an officer or employee of the Government are charged with notice of the limitations upon his authority. *Wilber National Bank* v. *United States*, 294 U. S. 120; *Sutton* v. *United States*, 256 U. S. 575; *Utah Power & Light Co.* v. *United States*, 243 U. S. 389.

There is, however, a more compelling reason for holding that petitioner's right to the sum awarded it by the Motor Carrier Claims Commission did not become fixed and unconditional in 1951 when the decision in the R–B Freight Lines case was promulgated by the Motor Carrier Claims Commission. Assuming, for the present argument, that the Government was bound by the informal understanding between representatives of the carriers and certain personnel of the Department of Justice, it is clear that the Commission's decision in the R–B Freight Lines case did not become final until 1952, when the Supreme Court denied the petition for writ of certiorari. *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88; *London-Butte Gold Mines Co.*, 41 B. T. A. 852, affd. 116 F. 2d 478; *H. Liebes & Co.* v. *Commissioner, supra; North American Coal Corporation*, 28 B. T. A. 807; *W. W. Sly Manufacturing Co.*, 24 B. T. A. 65. For a general discussion as to when items subject to litigation are accruable, see 2 Merten, Law of Federal Income Taxation, secs. 12.65, 12.66.

Petitioner contends, however, that the circumstances surrounding the Supreme Court's denial of the petition for writ of certiorari in the R–B Freight Lines case demonstrate that the petition was not timely, and therefore, that the Supreme Court had no jurisdiction to review the Commission's decision therein. Accordingly, petitioner argues that the decision of the Commission in the R–B Freight Lines case became final in 1951 upon its promulgation, or not later than the expiration of 3 months from the date it was filed with the clerk,[3] or from the date the motion for rehearing therein was denied. We do not agree.

In this connection, referring to the "Brief of the United States on Petition for a Writ of Certiorari to the Motor Carrier Claims Commission, *United States* v. *R–B Freight Lines, Inc.*, 342 U. S. 833 [933] (1952)," petitioner points to the fact that the Government's application for an extension of time within which to file a petition for writ of certiorari was granted by the Supreme Court upon the express condition that there be "statutory authority therefor." It is to be noted, however, that in the petition and brief filed on behalf of the United States, the question of the jurisdiction of the Supreme Court and the timeliness of the filing of the petition for writ of certiorari therein was thoroughly presented to the Supreme Court, and that counsel for the respondent therein, on its brief, acquiesced in the conclusions of the United States with reference to the jurisdiction of the Supreme Court and the timeliness of the petition for writ of certiorari. For convenience we set forth below the chronology of the pertinent events as disclosed by the Supreme Court record in the case of *United States* v. *R–B Freight Lines, Inc.*, 342 U. S. 933 (No. 484, October Term—1951).[4]

The order of the Supreme Court denying the petition for writ of certiorari does not disclose the basis for such denial. In any event it was for the Supreme Court, and the Supreme Court alone, to determine whether it had jurisdiction (Cf. *United States* v. *Shipp*, 203 U. S. 563, 573; *United States* v. *United Mine Workers of America*, 330 U. S. 258), and until its order denying the petition for writ of certiorari was handed down on February 4, 1952, the decision of the

---

[3] Sec. 9 (a), of the Motor Carrier Claims Act, p. 7.

[4] 1. Final determination by Motor Carrier Claims Commission, April 28, 1951.

2. Final order and award May —, 1951.

3. Motion for rehearing, filed May 8, 1951.

4. Motion for amendment of final determination, filed June 26, 1951.

5. Order granting motion and amending final determination and denying motion for rehearing, dated July 24, 1951.

6. Order signed by Chief Justice Vinson and dated October 20, 1951, extending time to file petition for writ of certiorari: "Upon consideration of the application of counsel for petitioner, It is ORDERED that the time for filing petition for writ of certiorari in the above entitled motion be, and the same is hereby, extended to and including December 22nd, 1951, provided there is statutory authority therefor."

7. Petition for writ of certiorari, filed December 19, 1951.

8. Certiorari was denied by the Supreme Court on February 4, 1952. 342 U. S. 933.

Motor Carrier Claims Commission in the R–B Freight Lines case did not become final.

The second issue for decision is whether the award was an involuntary conversion payment within the meaning of section 117 (j) of the Internal Revenue Code of 1939 and therefore subject to capital gains treatment. In this regard we do not think, as petitioner contends, that the holding of the Motor Carrier Claims Commission is res judicata for the purpose of determining the existence of a compulsory conversion of property within the meaning of section 117 (j) of the Internal Revenue Code of 1939. A decree is res judicata between the same parties in a different litigation "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." *United Shoe Machinery Corporation et al.* v. *United States*, 258 U. S. 451; *Larsen* v. *Northland Transportation Co.*, 292 U. S. 20. In reaching its findings and conclusions, the Motor Carrier Claims Commission was concerned with the question whether petitioner's property had been "taken" within the meaning of the Fifth Amendment to the Constitution. It was in no way confronted with the issue now before us. Therefore, the Commission's determination that just compensation was due petitioner does not control our consideration of the issue whether the award was an involuntary conversion payment under section 117 (j).

The statute provides:

SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

\* \* \* \* \* \* \*

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph:

(A) In determining under this paragraph whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsection (d) shall not apply.

(B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

For the purpose of this section, the "involuntary conversion" of property is the conversion of such property into money or other property as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof. Regs. 118, sec. 39.117 (j)–1 (a) (2). Thus, cash compensation received from the United States for property which was damaged, destroyed, or converted, while in possession of the United States under a lease entered into by the taxpayer under threat of condemnation, is an involuntary conversion payment. *Guy L. Waggoner*, 15 T. C. 496. However, if property is taken for *temporary use* but the owner continues to possess title and all other incidents of ownership of the property, the amount recovered to compensate the owner is income rather than capital gain from an involuntary conversion. Cf. *Nicholas W. Mathey*, 10 T. C. 1099, affd. 177 F. 2d 259, certiorari denied 339 U. S. 943.

In the instant case petitioner's property was not destroyed, either wholly or in part. Furthermore, the United States did not convert any of petitioner's assets to money or other property nor did it acquire the ownership of petitioner's property by requisition or threat of condemnation. At all times during the period of Federal control petitioner retained title to its properties. It is clear that the "taking" by the United States consisted of the control and operation of petitioner's transportation system for a temporary period, not a condemnation or conversion of petitioner's property.

In a case of taking for temporary use the normal measure of just compensation is the fair rental value of the property so taken and used. *United States* v. *General Motors Corporation*, 323 U. S. 373; *Kimball Laundry Co.* v. *United States*, 338 U. S. 1. Because it found that petitioner was deprived of the right to rent out its property, the Motor Carrier Claims Commission found no reason to depart from the rental measure in deciding petitioner's claim. Therefore, on the basis of market net rental value, the Commission fixed the amount of compensation due petitioner. Since the award was essentially a substitute for rental which petitioner would have received had there been no seizure, we hold that the full amount of the award received by petitioner in 1952 was income within the meaning of section 22 (a), Internal Revenue Code of 1939. *Hort* v. *Commissioner*, 313 U. S. 28.

*Walter A. Henshaw*, 23 T. C. 176, relied on by petitioner in support of its contention that its property had been involuntarily converted into a claim for damages is clearly distinguishable. In that case an amount received by the taxpayers in compromise of judgment to compensate them for the partial destruction of oil properties was held to be an involuntary conversion payment and taxable as capital gain. Petitioner here has not shown that any of its vehicles or other busi-

ness properties were destroyed, rendered useless, or damaged during the period of Federal control.

In computing the compensation due petitioner, the Commission determined that a sum calculated at 4 per cent per annum from the date of termination of Federal possession and control was to be added to the amount of the award. This sum represented part of the total compensation paid petitioner and regardless of whether it is called "interest" or payments to meet the requirement of just compensation, it is income rather than capital gain. *Kieselbach* v. *Commissioner*, 317 U. S. 399.

The third issue deals with the accruability of an additional insurance premium expense assessed against petitioner. Petitioner does not contest its liability for the full amount of additional premium and respondent concedes that the premium payment is a proper deduction. The sole question is whether the expense is properly deductible in 1952.

In *Columbus & Southern Ohio Electric Co.*, 26 T. C. 722 (appeal pending), the rules with respect to the accruability of expense items were set out as follows:

An expense accrues when all the events have occurred which fix its amount and determine that it is to be incurred by the taxpayer. *United States* v. *Anderson*, 269 U. S. 422 (1926). Where an item depends upon a contingency or future events, it may not be accrued until the contingency or events have occurred and fixed with reasonable certainty the fact and amount of the liability. *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88 (1936) ; *Lucas* v. *American Code Co.*, 280 U. S. 445 (1930). Where liability is substantially in controversy, accrual must await the resolution of the controversy. *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281 (1944) ; *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516 (1944) ; *Atlantic Coast Line Railroad Co.*, 4 T. C. 140 (1944). * * *

Under the terms of petitioner's policy the insurance company was authorized to compute a retrospective premium in addition to the standard premium charged for automobile liability protection. The total retrospective premium was stated to be a percentage of the standard premium plus the sum represented by "incurred losses" multiplied by a certain factor. The policy defined "incurred losses" to mean actual losses paid by the insurance company plus any reserves set up by the company to cover unpaid losses outstanding at the time of any adjustment. However, the total retrospective premium could not exceed a maximum retrospective premium, nor be less than a minimum retrospective premium. It is thus apparent that in order to avoid paying unusually high premiums for complete protection of all of its vehicles petitioner agreed to pay a retrospective premium based on automobile casualty losses arising out of the operation of its vehicles. This additional premium was limited to a maximum amount

equal to 1½ times the standard premium, regardless of the number and amount of losses.

In computing the total retrospective premium, the insurance company was authorized by the terms of the policy to make three computations: The first, between 6 and 8 months after termination of the policy; the second, between 18 and 20 months after termination of the policy; and the third, between 30 and 32 months after termination of the policy. Furthermore, the policy explicitly provided that the total retrospective premium determined by the third computation was to be the *final* retrospective premium unless petitioner and the company did not agree as to the amount of reserves carried on any unpaid losses outstanding at that time. If there was disagreement, the final computation of the retrospective premium was to be postponed until the total liability of the company for unpaid losses outstanding was definitely determined, or until the parties agreed as to the amount of reserves. The policy further provided that after the first computation petitioner was to pay the difference between the retrospective premium and the premium previously paid, if the total retrospective premium was greater.

The facts disclose that during 1948, while the policy was in force, a claim for damages was made by one Emery against petitioner as a result of an accident involving one of its trucks. On December 2, 1948, the policy was canceled. Thereafter, in 1950, the insurance company set up a reserve of $25,000 to cover the claim. This amount became an "incurred loss" within the meaning of the policy definition and was taken into consideration by the company in computing the retrospective premium. On June 15, 1950, petitioner was notified by an agent of the company that the reserve had been set up. The inclusion of this reserve in the computation resulted in an additional retrospective premium of $5,200.94. The notification letter also pointed out that regardless of whether the reserve amount was $15,000 or more, the additional retrospective premium would be the maximum permitted under the policy. Petitioner was asked to make immediate payment under the policy, but was informed that if subsequent events resulted in a reduced retrospective premium, petitioner would be entitled to a refund. Thereafter, in 1952, the claim against petitioner was settled by the company. Petitioner paid the full amount of retrospective premium due, $5,200.94, in 1953.

We conclude from these facts that prior to 1952 all events had occurred which fixed with reasonable certainty the fact and amount of petitioner's liability for an additional retrospective premium. The total retrospective premium had been computed on the basis of the reserve set up in 1950 to cover the claim against petitioner. The amount of this reserve was not contested by petitioner and it was

sufficiently large to justify the assessment of the maximum retrospective premium. Subsequent settlement of the pending claim would not affect the computation of retrospective liability, for the amount of the *reserve* controlled the amount of additional premium. Although settlement might have resulted in an adjustment which would entitle petitioner to a refund in the future, such an adjustment would not postpone the accruability of the premium expense. *Louis S. Cohn Co.*, 12 B. T. A. 1281. Furthermore, under the terms of the policy no further computation of the total retrospective premium was to be made after August 1951 (a period of 32 months after the termination of the policy) unless petitioner and the company disagreed as to the amount of reserves carried on unpaid losses. Since petitioner never disagreed with the amount of reserve set up to cover the Emery claim, no events occurring after 1951 could have affected the determination of liability in 1950. Attempts by petitioner, after payment of the Emery claim, to have the amount of the retrospective premium reduced, as conceded by petitioner on brief, did not constitute an existing contest such as would defer its accruability. We therefore hold that the fact and amount of petitioner's liability for the additional premium was fixed with reasonable certainty prior to 1952. *Columbus & Southern Ohio Electric Co.*, *supra.*

Reviewed by the Court.

*Decision will be entered under Rule 50.*