**WHEELOCK BROS., Inc. v. UNITED STATES.**

No. 46982.

United States Court of Claims.

Feb. 6, 1950.

Madden, J., dissented.

Robert G. May, Sioux Falls, S. D., for amicus curiæ.

Before JONES, Chief Judge, WHITAKER, LITTLETON, MADDEN and HOWELL, JJ.

WHITAKER, Judge.

The plaintiff, a motor truck common carrier, sues to recover just compensation for the alleged temporary taking by the Government of its property and business during the period from August 11, 1944, to July 24, 1945. The action of the Government, which is claimed by the plaintiff to have amounted to a taking, was done pursuant to Executive Order No. 9462, August 11, 1944, 9 F.R. 10071.

The plaintiff, a Missouri corporation, operates its trucks over routes between Kansas City and Chicago, and Kansas City and Denver, serving also some intermediate points in Missouri, Illinois, Kansas, and Colorado. It operates under certificates of convenience and necessity issued by the Interstate Commerce Commission. It was one of 112 motor carriers who comprised the Midwest Operators Association which conducted collective bargaining negotiations for its members with the union of over-the-road drivers. An impasse occurred in the negotiation of a new agreement, and on October 31, 1943, the Secretary of Labor certified the dispute to the National War Labor Board pursuant to the War Labor Disputes Act. Act of June 25, 1943, 57 Stat. 163, 50 U.S.C.A.Appendix, §§ 1501–1511.

On February 7, 1944, the National War Labor Board held that the wages should be increased by 7 cents per hour and 2.5 mills per mile, retroactive to November 16, 1943. On July 12, 1944, the Chairman of that Board made a report to the President, a part of which report is quoted in Finding 4. He said that 103 of the operators, members of the Midwest Operators Association, had refused to acquiesce in the Board's determination; that the union had voted to strike on June 30; that the Board had intervened and averted that strike, but that at a compliance hearing the operators refused to comply; that some 70 percent

Max Siskind, New York City and Lowell L. Knipmeyer, Kansas City, Mo., for the plaintiff. Leo B. Parker, Kansas City, Mo. and William M. Boyle, Jr., Washington, D. C., were on the briefs.

D. B. Macguineas, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

of the annual tonnage of 4,720,000 tons carried by the noncomplying carriers was immediately related to the war effort; and that the dispute was "a labor disturbance which threatens to interrupt the flow of goods essential to the effective prosecution of the war." The Board therefore reported the case to the President for such action as he might deem appropriate.

On August 4, 1944 the drivers of the 103 noncomplying operators struck to compel the operators to pay the wage increases determined by the War Labor Board. The trucks of these operators, of whom the plaintiff was one, ceased to operate. On August 11, 1944 the President issued Executive Order No. 9462, *supra*, a part of the text of which is printed in Finding 6. The plaintiff was included in the list of 103 motor carriers attached to the Executive order. The order authorized and directed the Director of the Office of Defense Transportation: " * * * to take possession and assume control of, and to operate, or arrange for the operation of, the motor carrier transportation systems of the motor carriers named in the list * * * including all real and personal property and other assets, wherever situated, used or useful in connection with the operation of such systems, in such manner as he may deem necessary for the successful prosecution of the war; and to do anything that he may deem necessary to carry out the provisions and purposes of this order."

On the same day that the President issued his Executive order the Director of the Office of Defense Transportation sent to the plaintiff a telegram advising it that, by order of the President, " * * * I have today issued an order taking possession and control as of 12:01 A.M. on August 12, 1944, of your motor carrier transportation system and all property used or useful in the operation thereof. Pending receipt of operations orders placed in the mail today, you should continue to manage and operate or resume operation, if possible, in the usual manner. Operations orders will contain further directions. Ellis T. Longenecker has been appointed Federal Manager in charge of operation of systems taken over. On behalf of the Government

and the Armed Forces I bespeak the full and hearty cooperation of both management and labor in the continuance or resumption of transportation service so sorely needed at this time to avoid imperiling an earlier conclusion of this war."

Also on the same day, August 11, 1944, the Director of the Office of Defense Transportation sent to the plaintiff and the other 102 carriers a Notice and Order appointing Ellis T. Longenecker Federal Manager of the systems and properties "taken hereunder" with "full authority, subject to my direction": "(A) To possess, control, and operate, or arrange for the operation of, each of the systems and properties taken hereunder * * *."
The notice said, in its paragraph 4: "4. A copy of this Notice and Order shall be posted by each carrier in the principal place of business or headquarters of its transportation system and in each terminal maintained in connection with its operation."

The Director of the Office of Defense Transportation, hereafter referred to as ODT, appointed a Federal Manager to operate the transportation systems taken over. The Federal Manager issued an order directing plaintiff and other carriers: "To resume or continue the operation of your motor carrier transportation system in the usual and ordinary manner and course of business, as a going enterprise, in your present corporate, partnership, individual or trade name, as the case may be, * * * as fully as if possession and control had not been taken and assumed by the United States, *subject, however, to the terms of said Executive Order and to all general orders, rules, regulations, and directions, which may be issued thereunder.*" (Italics ours.)

These things, in our opinion, constitute a definite and unequivocal taking of plaintiff's property. Plaintiff no longer had any right to manage and control its business except to the extent the Director of ODT permitted. Plaintiff was given an amount of discretion in the management of its business, but this was only by permission of the sovereignty which had taken over its business.

It was even provided in the Executive Order that "no attachment by mesne process, garnishment, execution, or otherwise shall be levied on or against any of the real or personal property or other assets, tangible or intangible, in the possession of the Director hereunder." This provision of the Executive Order was valid only because the property was the property of the United States Government and, therefore, not subject to execution or attachment. The President was without power to issue such an order if the property was still plaintiff's property.

Although the defendant did not exercise complete control over plaintiff's business, it very definitely did so in several very important respects.

It required plaintiff to pay the increased wages which the War Labor Board had found its employees were entitled to. Plaintiff had been unwilling to pay these wages, but the defendant, by virtue of its taking of plaintiff's property, as the temporary owner of such property, directed that these increased wages be paid. It had no right to direct that they be paid except by virtue of its ownership of the property.

Secondly, defendant directed that plaintiff increase its rates for the carriage of freight. It had no right to do this except by virtue of its temporary ownership of the property.

Defendant further directed that plaintiff keep its books so as to separate transactions during Government possession and control from prior transactions. It was directed that "revenues represented by freight bills dated prior to 12:01 a. m. August 12, 1944, for shipments delivered after that date shall be equitably apportioned to the prior and subsequent periods * * *." It was also ordered that "new ledger accounts shall be opened for the purpose of entering the transactions applicable to the period subsequent" to 12:01 a. m. August 12, 1944. (For further instructions relative to the keeping of accounts see finding 12.)

Plaintiff was also required to furnish the Federal Manager with various items of information, including, among others, the following: (1) the approximate number of gallons of motor fuel necessary for the continuous and economical operation of its system from October 1, 1944, to October 1, 1945; (2) locations where motor fuel should be delivered; (3) the unit price the carrier was paying for motor fuel; (4) the estimated number of new truck tires and tubes necessary for operation during the period; (5) the price being paid for tires and tubes, and the location where new tires and tubes should be delivered; (6) the number of new motor trucks which would be needed, and the price payable for them, and the place where they should be delivered.

A number of other orders and directions were issued.

Its assumption of possession and control of plaintiff's property was, therefore, more than nominal. It was actual possession and control. Defendant not only asserted possession and control; it exercised it; and, as the owner, it required plaintiff to do things which plaintiff theretofore had been unwilling to do.

Plaintiff was permitted to continue to manage its business only so long as it obeyed such directions as were issued by the Federal Manager. As the findings show, plaintiff repeatedly objected to orders issued by the Federal Manager, but was required to obey them or be ousted from management.

In the case of truck lines which did not obey the Federal Manager's directions, the management of those lines was actually ousted, and was replaced by persons designated by the Federal Manager.

Under these circumstances we think it is impossible to say that the defendant did not take actual possession and control of plaintiff's property within the meaning of the Fifth Amendment.

In the case of United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, it was contended that miners working in mines that had been seized by the Government were Federal employees and that, therefore, the prohibition against injunctions in labor disputes contained in the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., did not apply. The court said

330 U.S. at p. 284, 67 S.Ct. at page 691 that Congress, in passing the War Labor Disputes Act, "intended that by virtue of Government seizure, a mine should become, for purposes of production and operation, a Government facility in as complete a sense as if the Government held full title and ownership." The court pointed to the agreement entered into between the United Mine Workers and the Secretary of the Interior providing for wages and operating conditions, and then said 330 U.S. at page 288, 67 S.Ct. at page 693: "The defendants, however, point to the fact that the private managers of the mines have been retained by the Government in the role of operating managers with substantially the same functions and authority. It is true that the regulations for the operations of the mines issued by the Coal Mines Administrator provide for the retention of the private managers to assist in the realization of the objects of Government seizure and operation. The regulations, however, also provide for the removal of such operating managers at the discretion of the Coal Mines Administrator. Thus the Government though utilizing the services of the private managers, has nevertheless retained ultimate control."

The court concluded: "We hold that in a case such as this, where the Government has seized actual possession of the mines, or other facilities, and is operating them, and the relationship between the Government and the workers is that of employer and employee, the Norris-LaGuardia Act does not apply."

The material facts in that case and in this case are the same.

On the authority of that case it seems to us that this trucking company became, in the words of the Supreme Court, "a Government facility in as complete a sense as if the Government held full title and ownership."

We do not think this is in conflict with our opinion in Marion & Rye Valley Railway Co. v. United States, 60 Ct.Cl. 230, 249 et seq. So far as the opinion in that case shows, plaintiff's management and control of its business was interfered with in no way. It does not appear that plaintiff was required to raise the wages of its employees. It does not appear that it was required to increase its freight and passenger rates. It does not appear that it was required to keep separate books of accounts during the period of Government possession and control. None of those things which we have mentioned heretofore seems to have been required of the plaintiff in that case. The opinion reviews several orders issued by the Director General of Railroads and says that "none of these interfered in any way with the control and operation of its property by the plaintiff."

As we have pointed out above, the operation of the truck lines of Wheelock Brothers, Inc., was interfered with very definitely —in particular in the matter of wages and rates.

We think it is beside the point to say that it was necessary for plaintiff to pay these increased wages in order to continue operations and that it was necessary for it to charge higher rates. Whether or not this is so, it raised wages and increased rates because the defendant directed it to do it. It did these things at defendant's direction and despite the fact that it had refused to do them before defendant assumed possession and control.

The defendant wanted the truck lines to continue to operate. The drivers refused to operate the trucks unless increased wages were paid and the operators refused to pay them. The Government had no right to order the companies to continue operation unless they wished to do so. Since they were unwilling to do so, the Government had no other way to bring about continued operation except by taking possession of the lines and operating them itself. This it did.

■ Although we think that defendant did take plaintiff's property and is liable to pay just compensation for the taking, it is difficult to find a basis for awarding compensation. Ordinarily, the measure of liability, where the Government takes temporary possession of property, is its rental value. United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L. Ed. 311, 156 A.L.R. 396. But plaintiff

was unable to show what the rental value of its business was. It did show the rental value of its equipment, but the Government did not rent its equipment. Plaintiff continued to use it, subject to the defendant's direction and control, and continued to derive revenue from its use. Had plaintiff denuded itself of its equipment by renting it out, it would have lost its franchise and good will and would have had to go out of business. This franchise and good will we have found to have had a value on August 11, 1944, the date of the taking, of $125,000.00. (Plaintiff claims it diminished in value during Government control in the amount of $130,000.00.) The fair rental value of its equipment we have found was $107,381.82. It will thus be seen that had plaintiff rented out its equipment, it would have lost more than it gained.

■ In a case such as this, where an owner remains in actual possession of its property and continues to realize and enjoy the profits from its use, we think the best measure of just compensation is that indicated in Marion & Rye Valley Railway Co. v. United States, 270 U.S. 280, 282, 283, 46 S.Ct. 253, 254, 70 L.Ed. 585; "* * * We have no occasion to determine whether in law the President took possession and assumed control of the Marion & Rye Valley Railway. For even if there was technically a taking, the judgment for defendant was right. Nothing was recoverable as just compensation, because nothing of value was taken from the company, and it was not subjected by the government to pecuniary loss. Nominal damages are not recoverable in the Court of Claims. Grant v. United States, 7 Wall. 331, 338, 19 L.Ed. 194.

* * * * * *

"He did not at any time take over the actual possession or operation of the railroad, did not at any time give any specific direction as to its management or operation, and did not at any time interfere in any way with its conduct or activities. The company retained possession and continued in the operation of its railroad throughout the period in question. The railroad was operated during the period exactly as it had been before, without change in the manner, method or purpose of operation. The railroad did not serve any military camp, nor did it transport troops or munitions. The character of the traffic remained the same. Nothing appears to have been done by the Director General which could have affected the volume or profitableness of the traffic or have increased the requirements for maintenance or depreciation, and apparently it retained its earnings, expended the same as it saw fit, and, without accounting to the government, devoted the net operating income to the company's use."

Whatever pecuniary loss was caused plaintiff by the control exercised by defendant should be repaid it. This we think is the best measure of just compensation.

■ The only things which the Government did in this case which could have caused plaintiff any loss or extra expense was the requirement for the payment of increased wages and the requirement that it increase its rates and the expense of making the reports required. The increased wages paid amounted to $4,964.68. Plaintiff claims the increased rates it was required to put into effect caused it a loss, but it is impossible to tell from the proof whether this caused a loss or resulted in a gain. The expense of preparing the required reports is not shown.

Nor is it shown that the Government's requirement that plaintiff continue operations, against its will, caused plaintiff a loss, except for the amount of the increased wages paid. It is true that plaintiff sustained a loss on operations, but it also had a loss in the two previous years and also in the year following the Government's relinquishment of control. That its loss during Government control was due to that control is not shown.

We are not sure that the net result of the payment of the increased wages ordered by the Federal Manager resulted in a loss to plaintiff. If plaintiff had continued to refuse to pay them, its losses might have been greater than they were; but this is pure speculation. What we do know is that the defendant required plaintiff to pay these increased wages and that this increased its cost of operation by the

sum of $4,964.68. To show that it would have sustained a greater loss if these wages had not been paid was a burden which the plaintiff's evidence cast upon the defendant. That evidence has not been produced.

We hold, therefore, that defendant is liable to pay plaintiff the sum of $4,964.68, as an extra expense to which plaintiff was put as the result of Government occupation and control.

Judgment for this amount will be entered.

HOWELL, and LITTLETON, JJ., and JONES, Chief Judge, concur.

MADDEN, Judge, dissenting.

I am unable to agree with the court's decision and opinion. I think that the Government did not take the plaintiff's property, in fact or within the meaning of the Constitution. Disregarding the words used in the Government's directives, the acts which must be relied on to constitute a taking are the following: (1) The Government ordered the plaintiff to pay, for the future, the wage increase which had some months before, been directed by the War Labor Board. (2) The Government required the plaintiff to increase the rates for some of its services. (3) The Government forbade the seizure by creditors of the property of the plaintiff without the Government's specific or general consent, which consent it gave upon application to permit the plaintiff to purchase needed equipment. (4) The Government required some extra accounting which, though of the same general type required of the plaintiff for other purposes, was in addition to what the plaintiff would otherwise have done.

As to (1), the increased wages, even in peacetime the Government fixes wages and requires their payment as fixed. The Fair Labor Standards Act, 52 Stat. 1063, 29 U.S.C.A. §§ 201–219, is an example. This is, of course, regulation, and not a taking of the employer's plant or business. I do not see why it is a taking when, in the emergency of war, essential means of transportation are rendered useless by a strike

and can be restored to use by a Government order that the wages found to be equitable by the body responsible for making such determinations should be paid, and the Government makes such an order. In fact and in reality it is not a taking. The business resumes, the legally fixed wages are paid. The employer's situation is like that of his thousands of fellow employers who are obliged to pay legally fixed wages.

As to (2), the Government's increase, against the plaintiff's will, of some of its freight rates, the plaintiff was an interstate common carrier, a public utility, whose rates are, of course, subject to public regulation. If, in the emergency, that regulation was exercised by one Governmental agency, the Office of Defense Transportation, rather than another, the Interstate Commerce Commission, that can hardly constitute the difference between regulation and taking. As to (3), the Government's forbidding that a public utility be disabled from rendering the service which it is required to render under its franchise, by the seizure of its facilities by creditors, that is nothing more than a rule of law applied for the protection of the public interest. One's property is not taken by the State because it is exempted by the law of the State from seizure by his creditors. As to (4), the extra burden of accounting which was imposed upon the plaintiff, there are, of course, many laws requiring the keeping and supplying to local or State or Federal Governmental units various kinds of accounts and records. The plaintiff itself had to file accounts with the Interstate Commerce Commission giving much of the same information required by the Federal Manager.

The court relies upon the case of United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884. But the Supreme Court there had for decision only the question whether the workers in the mines, were, for the purposes of that case, employees of the Government and therefore not covered by the Norris-LaGuardia Act. There the Government and the union had, pursuant to the Executive order, entered into a new and formal collective bargaining contract

substantially changing the former contract in many important respects. This contract was solely between the Government and the union. The mine operators were not parties to it. The president of the union had referred to the operators as "strangers to the * * * agreement" and had said, "The mine workers do not propose to deal with parties who have no status under that contract." The report of the case does not disclose the extent to which the Government, in fact, interposed itself in the operation of the mines; hence we have no basis for comparing the instant case with the United Mine Workers case as to the actual conduct which, I think, must be the determining factor as to whether or not there has been a taking.

In the instant case, throughout the period of Government control the same officers of the plaintiff who had always managed the business continued to do so. The employees were the same, except for turnover having no relation to Government control. Business was solicited, bills were collected, checks were drawn, employees were hired and discharged just as had always been done. The plaintiffs had their property. That seems to me to show that the Government did not have it.

I do not understand why the court has placed upon the defendant, the Government, the burden of proving that the plaintiff did not suffer a loss in the payment of the increased wages directed by the Government. I would have supposed that, since the Government's conduct is not claimed to have been wrongful in any respect, and since the evidence necessary to prove loss or lack of it was not particularly within the control of Government, the usual rule would apply and the plaintiff would have to prove its case. But regardless of the burden of proof, I think it is quite clear from the evidence, and from the circumstances of the time in question of which we are judicially aware, that the plaintiff could not have operated its business without increasing its wages, and that even a few more days of being closed down by the strike would have caused the plaintiff a greater loss than the increase in wages amounted to for the period of Government control.