**MIDWEST MOTOR EXPRESS, Inc.,**
**Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

No. 15793.

United States Court of Appeals
Eighth Circuit.

Jan. 15, 1958.

Rehearing Denied April 16, 1958.

Joseph A. Maun, St. Paul, Minn. (William R. Busch, and Bundlie, Kelley & Maun, St. Paul, Minn., on the brief), for petitioner.

Morton K. Rothschild, Atty., Dept. of Justice, Washington, D. C. (John N. Stull, Acting Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Robert G. May, Brent O. Stordahl, Nils A. Boe, Sioux Falls, S. D., and Hoyt Crooks, St. Paul, Minn., amici curiae.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Petitioner, a North Dakota corporation, is and, at all times pertinent hereto, was engaged in business as a Class I common carrier of property by motor vehicle in interstate commerce. Prior to August 11, 1944, and during the prosecution of World War II, petitioner and approximately 100 other associated midwestern motor carriers were operating under substantially similar contracts with an over-the-road drivers union. An impasse in wage negotiations ultimately resulted in a determination by the National War Labor Board that wage rates should be increased. Petitioner and numerous other associated carriers concluded that they could not afford the increase and in August, 1944, their drivers went out on strike. In order to avoid hampering of the war effort and to keep the transportation systems in operation, the President by Executive Order on August 11, 1944, No. 9462, U.S.Code Cong.Service 1944, p. 1496, seized possession and control of the transportation systems and other properties used therewith and owned by the associated midwestern motor carriers, including those of petitioner herein. The seizure was through the Director of the Office of Defense Transportation. The Executive Order provided:

"2. Subject to the applicable provisions of existing law, including the orders of the Office of Defense Transportation, issued pursuant to Executive Orders 8989, as amended, 9156 and 9294, the said transportation systems shall be managed and operated under the terms and conditions of employment in effect between the carriers and the collective bargaining agents at the time possession is taken under this order. During his operation of said transportation systems the Director shall observe the terms and conditions of the directive order of the National War Labor Board, dated February 7, 1944; provided, however, that in the case of each said transportation system the Director is authorized to pay the wage increases provided for by the said directive order of the National War Labor Board, which accrued prior to the taking of possession of said system under this order, only out of the net operating revenue of the said system."

The Executive Order further provided:

"4. Possession, control, and operation * * * shall be terminated by the Director when he determines that such possession, control, and operation are no longer necessary for the successful prosecution of the war."

Operations Order No. 1 provided, among other things:

*"Title to the properties and other assets of which possession has been taken remains in the owners thereof. Possession by the United States is not exclusive, and the United States asserts, and will assert, only such control over the properties in its limited possession as may be necessary to accomplish the purposes of operation and of said Executive Order."* (Emphasis supplied.)

Such possession and control of petitioner's transportation system and property were terminated on September 28, 1945. Efforts by the owners at obtaining just compensation for the assumption of possession and control by the government ultimately resulted in the Congress creating a Motor Carrier Claims Commission to hear and determine all claims. Act of Congress of July 2, 1948 (62 Stat. 1222). The Act establishing the commission provided in part:

"Sec. 2. The Commission shall hear and determine, according to law, existing claims against the United States arising out of the taking by the United States of possession or control of any of the motor-carrier transportation systems * * *."

\* \* \* \* \*

"Sec. 6. The Commission shall receive claims for a period of six months after the date of enactment of this Act, and not thereafter. The *jurisdiction of the Commission over claims presented to it* as provided in section 2 of this Act *shall be exclusive;* but nothing in this Act shall prevent any person who does not elect to present his claim to the Commission from pursuing any other remedy available to him." (Emphasis supplied.)

The Act also provided that the Commission's determination should be subject to review in the same manner as is provided for cases in the Court of Claims upon application to the Supreme Court within three months from the date of filing of such determination.

On March 27, 1950, the petitioner herein filed a claim with the Motor Carrier Claims Commission for $196,019.49. Petitioner computed such amount due on the basis of what it believed to be the rental value of its properties during the period of government control. On May 19, 1952, the Commission made its determination that the United States was indebted to the taxpayer for $44,054.34, which amount was based on net rental value. During the period the petitioner's properties were under control of the government an operating profit of $21,012.57 was made and left with the business. The Commission found that the government was entitled to a credit of such amount, leaving a net of $23,041.77 plus " * * * a sum equivalent to interest at 4% per annum on the sum of $23,041.-77 from September 28, 1945, to date of payment, said sum also being a part of just compensation". Such item was computed to be $6,282.97, so that petitioner received a total of $29,324.74 from the United States during the year 1952 based upon the Commission's award. In its income tax return for the calendar year 1952 the petitioner disclosed the facts surrounding the receipt of the award but did not include any part thereof as taxable income.

The Commissioner, in determining a deficiency, concluded that the entire amount of the award was taxable income in the year 1952. The Tax Court (27 T.C. 167) held with the Commissioner, deciding that the petitioner's right to receive the award and the amount of the award were not fixed with reasonable certainty at any time prior to 1952 and accordingly the award was income during such year and, further, that the taxpayer was not entitled to treat the award as

capital gain under Section 117(j) of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A., because the award was not an involuntary conversion payment but ordinary income within the meaning of Section 22(a) of the 1939 Code, 26 U.S.C.A.

Petitioner asserts in this court:

"I. The Tax Court's decision that the sum of $29,324.74 received from the United States Government in 1952 by petitioner, an accrual basis taxpayer, as the result of an award made by the Motor Carrier Claims Commission, on account of the seizure of petitioner's motor carrier system in 1944, is reportable as income in the year 1952 is clearly erroneous and without support in the evidence.

"II. The Tax Court's decision that petitioner was not entitled to treat said award, made by the United States Government on account of its seizure of taxpayer's business, as an amount received upon the involuntary conversion of property as a result of the exercise of the power of requisition or condemnation as provided in Section 117(j) of the Internal Revenue Code of 1939 is clearly erroneous and without support in the evidence.

"A. The holding of the Motor Carrier Claims Commission that petitioner's property was taken for public use by the United States is res judicata for the purpose of determining the existence of an involuntary conversion of property under exercise of the power of condemnation within the meaning of Section 117(j).

"B. In the event that this Court decides the res judicata rule does not apply, the statute requires a finding of an involuntary conversion of property under the exercise of the power of condemnation within the meaning of Section 117(j).

"C. The facts here are such that all of the requirements of Section 117(j) are fulfilled."

We consider first the question of whether or not the Tax Court's determination that the award accrued in 1952 was correct. Petitioner here filed its income tax returns for calendar years and on an accrual basis. Section 41 of the Internal Revenue Code of 1939, 26 U.S.C.A., provides that the net income shall be computed upon the basis of the taxpayer's annual accounting period in accordance with the method of accounting regularly employed in keeping the books of such taxpayer. Section 42 provides that the amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer unless under methods of accounting permitted under Section 41 any such amounts are to be properly accounted for as of a different period. The petitioner here having filed its returns and kept its books on an accrual basis, the question is whether the award from the Motor Carrier Claims Commission accrued in 1952 as the Tax Court determined or in some earlier year, as contended by petitioner.

■ Petitioner's transportation system was operated under government control from August 11, 1944, to September 28, 1945. During that period a profit of $21,012.57 was realized. This was retained in the business and not taken by the government. Upon release of the petitioner from federal control, it made efforts to obtain additional compensation from the Office of Defense Transportation, which denied liability therefor. Subsequently, private relief bills were introduced in both houses of Congress. In 1948, on July 2, 62 Stat. 1222, an act establishing the Motor Carrier Claims Commission was passed. On March 27, 1950, the taxpayer filed with the Commission a claim in the amount of $196,019.49, which claim was still pending at the time the award was made on May 19, 1952. It is of significance also that the petitioner did not accrue the amount of the award in its returns prior to 1952. In its 1952 return it for the first time disclosed the facts with reference to the award. The Tax Court found that the right to receive

the award and the fixing of the amount thereof with reasonable certainty occurred in 1952. Findings of the Tax Court may not be set aside unless clearly erroneous. Rule 52(a), F.R.C.P., 28 U.S.C.A.; Card v. Commissioner of Internal Revenue, 8 Cir., 1954, 216 F.2d 93; Commissioner of Internal Revenue v. Newman, 8 Cir., 1957, 248 F.2d 473.

The Supreme Court has stated, in Security Flour Mills Co. v. Commissioner of Internal Revenue, 1944, 321 U.S. 281, 286–287, 64 S.Ct. 596, 598, 88 L.Ed. 725:

> "The rationale of the system is this: 'It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation.'
>
> "This legal principle has often been stated and applied. The uniform result has been denial both to Government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, *applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount.*" (Emphasis supplied.)

Dixie Pine Products Co. v. Commissioner of Internal Revenue, 1944, 320 U.S. 516, 519, 64 S.Ct. 364, 365, 88 L.Ed. 420:

> "It has long been held that in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer."

This court, in Craig v. Thompson, 8 Cir., 1949, 177 F.2d 457, 460, stated:

> "It is equally true that a taxpayer on the accrual basis must accrue income in the year in which the amount of the income is reasonably determinable, and the same rule applies to deductions for expenses. Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111; Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200; United States v. Anderson, supra [269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347]."

Petitioner's theory is that in 1944 when the government seized possession and control of its property it had an immediate right to just compensation under the Fifth Amendment to the Constitution, citing Wheelock Brothers, Inc. v. United States, 1950, 88 F.Supp. 278, 115 Ct.Cl. 733. That was a case where one of the associated motor truck carriers brought action against the United States in the Court of Claims. That court held the trucker entitled to compensation within the meaning of the Fifth Amendment, measured the liability of the government for the temporary taking of property by its rental value, and allowed plaintiff judgment. The Supreme Court, in United States v. Wheelock Brothers, Inc., 1951, 341 U.S. 319, 71 S.Ct. 730, 95 L.Ed. 966, vacated the judgment and ordered the case dismissed because Wheelock Brothers had filed a claim with the Commission and the Court of Claims, therefore, had no jurisdiction. Whatever force that case had was wiped out by the Supreme Court's order of dismissal.

In opposing the Tax Court's holding, the petitioner claims that the proper year for accruing the tax is 1951, when the Motor Carrier Claims Commission determined the R-B Freightlines, Inc. case, the first of the motor carrier awards allowed, arguing that, "At that time, the method of computing damages had been clearly established; that is, 'net fair rental value' of the equipment, property and franchises seized and possessed by the United States of America."

In support of its contention, petitioner cites a case from this court, Helvering v.

St. Louis Southwestern Ry. Co., 8 Cir., 1933, 66 F.2d 633, certiorari denied 292 U.S. 626, 54 S.Ct. 632, 78 L.Ed. 1481. That case involved the accrual of compensation in excess of the standard return for the government's use of a railroad during World War I. This court sustained a determination by the Board of Tax Appeals to the effect that compensation in excess of the standard return was accruable during 1918, 1919 and 1920, even though the amount was not settled and agreed upon until 1923. That case differs from the instant one in that there the Federal Control Act of March 21, 1918, c. 25, 40 Stat. 451, provided for the measure of compensation to the carriers and we do not consider it authority for petitioner's contention herein. Cf. Kentucky & Indiana Terminal R. Co. v. Commissioner of Internal Revenue, 6 Cir., 1931, 54 F.2d 738.

Petitioner also cites Continental Tie & Lumber Co. v. United States, 1932, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111. The Supreme Court held there that after the passage of the Transportation Act the right to an award was fixed and that the taxpayer's case presented problems no different from those confronting many business concerns which keep accounts on an accrual basis and have to estimate for the tax year the amount to be received on transactions undoubtedly allocable to such year. The case is authority for the proposition that where the taxpayer has in its own books and accounts data to which it could apply the calculations required by the statute and ascertain the quantum of the award within reasonable limits, the award is accruable in the year when the right thereto was fixed. It held that the function of the Interstate Commerce Commission in ascertaining the amount was purely ministerial. That situation is not comparable to the one which confronts the court in the instant case.

The 1951 income tax return of the petitioner does not accrue the award. That of course is not determinative but it is indicative of the conclusion that the taxpayer thought the amount not ascertainable within reasonable limits at that time. In addition thereto, the petitioner had a claim filed with the Motor Carrier Claims Commission in the amount of $196,019.49 up to the time in 1952 when the Commission made the actual award. We cannot say that the Tax Court's determination that the right to receive the award did not become final and definite in amount until 1952 is clearly erroneous. The Tax Court must be sustained as to the first issue.

With reference to petitioner's second point to the effect that this was an involuntary conversion of property and therefore subject to the provisions of § 117(j), I.R.C. of 1939, as amended, 26 U.S.C.A., petitioner first argues that the issue has been resolved in a prior proceeding. It contends that the Motor Carrier Claims Commission, in deciding the first case brought before it, determined that there was a seizure under the powers of eminent domain and that the amount paid was just compensation to which petitioner was entitled under the Fifth Amendment. Under the principles of *res judicata*, it says that the government cannot now relitigate that question, citing Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 402, 60 S.Ct. 907, 916, 84 L.Ed. 1263:

"The result is clear. Where the issues in separate suits are the same, the fact that the parties are not precisely identical is not necessarily fatal."

The issues before the Tax Court and the Motor Carrier Claims Commission were not the same. The issue before the Tax Court was whether there was a conversion of petitioner's property by the government within the meaning of § 117(j), 26 U.S.C.A. The case before the Motor Carrier Claims Commission involved the right to compensation and the amount thereof. The Commission's function was to "hear and determine, according to law, existing claims against the United States arising out of the taking by the United

States of possession or control of any of the motor-carrier transportation systems described * * * ". 62 Stat. 1222. The Commission did not decide and could not decide the question of whether or not the award was a conversion within the meaning of § 117(j). We do not consider the decision of the Commission as *res judicata* in the instant case.

■ Petitioner next argues that in the event the *res judicata* rule is not applicable, that the statute requires a finding of involuntary conversion of property under the exercise of the power of condemnation within the meaning of § 117 (j).

There are no decisions other than that of the Tax Court in the instant case dealing directly with the question of whether federal control of a business or an industry during the war time constitutes a conversion of property within the meaning of § 117(j) of the 1939 Code. The Tax Court in this case held, Midwest Motor Express, Inc. v. C. I. R., 27 T.C. 167, 185:

"For the purpose of this section [117(j)], the 'involuntary conversion' of property is the conversion of such property into money or other property as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof. Regs. 118, Sec. 39.117(j)–1(a)(2). Thus, cash compensation received from the United States for property which was damaged, destroyed or converted while in possession of the United States under a lease entered into by the taxpayer under the threat of condemnation is an involuntary conversion payment. Waggoner, 15 T.C. 496. However, if property is taken for temporary use but the owner continues to possess title and all other incidents of ownership of the property, the amount recovered to compensate the owner is income rather than capital gain from an involuntary conversion. Cf. Mathey,

10 T.C. 1099, affirmed [1 Cir.] 177 F.2d 259, certiorari denied 339 U.S. 943 [70 S.Ct. 797, 94 L.Ed. 1359].

"In the instant case petitioner's property was not destroyed, either wholly or in part. Furthermore, the United States did not convert any of petitioner's assets to money or other property nor did it acquire the ownership of petitioner's property by requisition or threat of condemnation. At all times during the period of Federal control petitioner retained title to its properties. It is clear that the 'taking' by the United States consisted of the control and operation of petitioner's transportation system for a temporary period, not a condemnation or conversion of petitioner's property."

Petitioner contends that there was here a taking within the meaning of the Fifth Amendment to the Constitution which provides " * * * nor shall private property be taken for public use, without just compensation," and that:

"Section 117(j) provides capital gain treatment for the 'compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or as exercise of the power of requisition or condemnation or the threat or imminence thereof) of property * * *.' The plain meaning of this statute covers petitioner's cause for a 'taking' or 'seizure' or 'condemnation' within the meaning of the Fifth Amendment can have no meaning outside of the contemplation of Sec. 117(j)."

But what did the government "take" or in lieu of what was the award made? It took limited possession and control of petitioner's transportation system and other properties used therewith, but it specifically left "titles to the properties and other assets" in the owners thereof. Its order provided that possession was not exclusive and that " * * * the United States asserts, and will assert,

**412**

only such control over the properties in its limited possession as may be necessary to accomplish the purposes of operation and of said Executive Order." What it amounted to was forcing the petitioner to continue operation of its transportation system. There was no conversion of capital assets within the meaning of § 117(j). What the government had was an enforced temporary use of petitioner's transportation system during the war emergency. That there was a "taking" within the meaning of the Fifth Amendment is conceded but that "taking" should not be allowed to obscure the characteristics of what was taken by the government or received in lieu thereof by petitioner. § 117(j) contemplates *capital* gains and losses, including gains and losses from involuntary conversion of capital. Title to the property here never left petitioner. Petitioner continued to operate its property with its own officers and employees for the period of government control. The Motor Carrier Claims Commission properly held that in the case of taking for temporary use the measure of just compensation was the fair rental value of the property used and that the rental value represented the petitioner's only money loss. The net payment to petitioner here is no more a return for property condemned or destroyed than was the $21,012.57 profits left with the business and credited against the gross award. The just compensation paid for enforced operation amounted to a payment for use, an enforced use, it is true, but a use nevertheless. Practical considerations prohibit calling this use or rental payment an involuntary conversion of capital assets. Petitioner's loss was measured properly by the fair rental value of the property during the time of government control. To allow that use payment to be denominated capital gain in order to arrive at a lesser tax rate would, in our opinion, be completely contrary to Congressional intent in enacting § 117 (j). We think the Tax Court was correct and its decision is accordingly affirmed.