GILLETTE MOTOR TRANSPORT, INC.,
Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17280.

United States Court of Appeals
Fifth Circuit.

April 1, 1959.

---

649

Joseph A. Maun, St. Paul, Minn., J.
W. Bullion, Dallas, Tex. (Bundlie, Kelley
& Maun, St. Paul, Minn., Thompson,
Knight, Wright & Simmons, Dallas, Tex.,
on the brief), for petitioner.

Davis Morton, Jr., Melva M. Graney,
Lee A. Jackson, Attys., Dept. of Justice,
Charles K. Rice, Asst. Atty. Gen., Dept.
of Justice, Charles Owen Johnson, Spe-
cial Atty., Arch M. Cantrall, Chief Coun-
sel, Int. Rev. Serv., Washington, D. C.,
for respondent.

Before HUTCHESON, Chief Judge,
and CAMERON and BROWN, Circuit
Judges.

JOHN R. BROWN, Circuit Judge.

This case presents the same question
dealt with by the 8th Circuit in Mid-
west Motor Express v. Commissioner,
27 T.C. 167; 8 Cir., 1958, 251 F.2d 405,
certiorari denied 358 U.S. 875, 79 S.Ct.
116, 3 L.Ed.2d 105. The problem is
whether the amount received as a Fifth
Amendment award of just compensation
was from involuntary conversion of
property under Section 117(j) of the
Internal Revenue Code of 1939, 26 U.S.
C.A. § 117(j). The facts, stipulated
there and here, are substantially the
same, but with great deference to that

distinguished Court, we reach the opposite conclusion.

The case, as is so often the situation with tax matters, is hardly one of contemporary history. What is at stake here is compensation to Gillette for commandeering its motor truck business in 1944–1945. After the lines were turned back by the government in 1945, the owners sought to negotiate Fifth Amendment just compensation. The efforts were unavailing. One operator sought and obtained a Court of Claims judgment. Wheelock Bros., Inc. v. United States, 1950, 88 F.Supp. 278, 115 Ct.Cl. 733; vacated for jurisdictional reasons, 1951, 341 U.S. 319, 71 S.Ct. 730, 95 L.Ed. 966. Because the Government took the position that each of the more than 100 cases would have to be separately litigated through the Court of Claims, the trucking interests sought the intervention of Congress. Congress passed the Motor Carriers Claims Commission Act. Act of July 2, 1948, Chapter 808, 62 Stat. 1222, 49 U.S.C.A. § 305 note. It was agreed substantially that the R-B Freight Lines claim would be tried by both sides as a test case to "establish the pattern for disposition of the cases to follow." The Claims Commission decided the R-B Freight Lines case and pursuant to the Act the Government sought certiorari direct from the Supreme Court. This was denied, United States v. R-B Freight Lines, 1952, 342 U.S. 933, 72 S.Ct. 376, 96 L.Ed. 695. The agreed stipulation here reflects categorically that this test case "understanding * * was not followed. The Department of Justice refused to go along with the R-B Freight Lines decision as a basis for settlement or disposition of the other claims because it desired to present to the Motor Carrier Claims Commission new and additional evidence bearing upon matters which it had considered unimportant; and because it desired to reiterate and further express the arguments previously advanced." The Carriers then proceeded to submit to the Claims Commission nine cases including Gillette's. The stipulation further shows that with ten down and about eighty-four more claims to go, it "* * * appeared that there would be substantial delays in the processing of all of the remaining cases * * * as long as the Government reserved its right to process each case separately and use up the full six months' period under which it had the technical right to file further petitions for certiorari." Faced with this situation "the carriers, including [Gillette], were in need of money and as a result, in 1952, authorized" their representative to make an agreement "under which the measure of compensation determined under the R-B Freight Lines principles would be reduced." Such agreement was made reducing the so-called rental value by approximately one-third.

The order and opinion of the Motor Carriers Claims Commission in Gillette's case which is part of the stipulated facts reflects that in that proceeding "the Government [contended] that such 'interference' as petitioner may have encountered from Government action did not amount to a taking of its property but merely to regulation." At another point it was stated "The respondent [Government] contends that, if anything was taken, the taking was of something far short of possession, occupancy, use, enjoyment, and managerial discretion."

These contentions were categorically rejected by the Claims Commission in its order and opinion of March 31, 1952. "* * * [T]he petitioner's transportation system and all its property used or useful in the operation of such system were taken for public use by * * * the United States, and were thereafter possessed, controlled and used by [Government] until * * * June 16, 1945." Concerning the argument that the "interference" was mere regulation, the Commission said, "To place any such construction on the acts done by the Federal Manager would be to belie the statements contained in the Executive Order * * Possession and control having been once taken, all things done by the Federal Manager were done by him as the representative of the United States charged

with maintaining for the United States its possession and control." Again it was stated, "In our opinion, however, the Executive Order and the Notice and Order of Possession and control leave no room for doubt as to what the Government took. Both documents call for the taking of possession and assumption of control of petitioner's motor carrier transportation system 'including all real and personal property and other assets, wherever situated, used or useful in connection with the operation of such system.' * * * We are concerned with what petitioner was deprived of. We find that petitioner was deprived of its property and of the right to determine what use should be made of it. * * *."

Now, seven years later, the Government is again contending that there was no taking of property. In the context of this income tax case, the Government contends that what Gillette received as Fifth Amendment just compensation was not for the taking of its property, but merely for its *use*.

We agree with the 8th Circuit that the problem may not be disposed of as one of res judicata, 251 F.2d 405, 411. But we do not so readily put to one side, as that Court seems to do, the findings of the Claims Commission. What was taken and how it was taken was the subject of that inquiry and decision. The payments received which are here the subject of the income tax claim as income or as capital gains came into being from that Award. As the Motor Carriers

Claims Commission it did not, of course, have statutory authority to determine tax matters or consequences. But as to a claim submitted to it, it had exclusive jurisdiction to determine whether there was a taking, what was taken, and what "just compensation" was required. See United States v. Wheelock Bros., Inc., 1951, 341 U.S. 319, 71 S.Ct. 730, 95 L.Ed. 966.

Despite the disavowal in its brief that "We [do not] have any quarrel with taxpayer's argument that the facts show a 'taking' of 'property' within the meaning of the Fifth Amendment," the effect of the Government's argument is to once again challenge the basic nature of this seizure of a truck line and its property. It is substantially the same contention in a different garb. The contention briefly is that as *title* was not taken over and the truck equipment was commandeered only temporarily and thereafter returned ten months later, it is obvious that the Government did not *take* any property, and all it got was the *use* of it. Continuing to the next step, the Government says that since the *use* of property is not a depreciable item, the involuntary governmental seizure does not qualify under Section 117(j) because there was no conversion of any "property used in the trade or business."[1]

So far as we are able to grasp the metaphysical dialectic which the Government's brief advances, it is the contention that conversion[2] of property un-

---

1. Section 117(j) (1) defines "property used in the trade or business."

"(1) *Definition of property used in the trade or business*. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily

for sale to customers in the ordinary course of his trade or business." 26 U.S.C.A., Int.Rev.Code of 1939, § 117(j), as added by Rev.Act of 1942, § 151(b), 56 Stat. 798.

2. Section 117(j), note 1, supra, provides:

"(2) *General rule*. If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used

der Section 117(j) arises only when full *title* is acquired or taken.[3]

When we bear in mind that "the tax law deals in economic realities, not legal abstractions," Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, at page 315, 76 S.Ct. 395, at page 399, 100 L.Ed. 347, 354, we think there can be no basis for these gossamer distinctions. They ignore the nature of the actual taking here as found authoritatively by the Claims Commission. They ignore the nature of seizure or condemnation by the Government. And they ignore the language of Section 117(j) which expressly expands relief beyond "sales or exchanges."

 We are here concerned with the "compulsory or involuntary conversion * * * as a result of * * * seizure, or an exercise of the power of requisition or condemnation * * *." § 117(j)(2). The idea of a peremptory commandeering of property by a sovereign is expressed in terms of a seizure, a requisition or a condemnation. As the sovereign was here the United States, it is positively established that the constitutional obligation of just compensation

has little, if anything, to do with *title*. "Broadly speaking, the United States may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings. Under the first method—physical seizure—no condemnation proceedings are instituted, and the property owner is provided a remedy under the Tucker Act * * * to recover just compensation." United States v. Dow, 1958, 357 U.S. 17, 21, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109, 1114. Taking possession of the property is the "event which gives rise to the claim for compensation *. * *." 357 U.S. 17, at page 22, 78 S.Ct. 1039, at page 1044. Title commensurate with the right appropriated undoubtedly passes at some stage, e.g., payment, but this is wholly incidental and in no way conditions the Government's power to acquire the property or its use or the significance of its taking.[4] The term "property" as used in the Fifth Amendment has "been employed in a more accurate sense to denote

---

in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *."

3. The Government's brief states: "But the fact that the Government's *use or control* was with respect to depreciable items used in taxpayer's trade or business does not establish that there was a conversion of those depreciable items.

"Taxpayer's concession (and indeed argument) that there was a taking of its 'property rights' is also the basic fallacy of its argument * * *. True, it may possibly be said, broadly, that an involuntary relinquishment of use for a temporary period is an involuntary conversion to the extent of an award for *use* during that period, as here, but

* * * Section 117(j) applies only to involuntary conversions of * * * depreciable property. The question is whether there was an 'involuntary conversion' of taxpayer's *depreciable* property. The control of such property was of course taken over by the Government but only for a limited and temporary period. It was for the *use* of such property for that limited period that taxpayer received compensation by way of an award * * *. Accordingly, there was no 'involuntary conversion' of taxpayer's *depreciable* property * * *." (Emphasis in original).

4. See Acquisition of Property for Wartime Purposes, published by the Lands Division of the Department of Justice 42–43 (1944), and Appendix I and II of Justice Frankfurter's concurring opinion, Youngstown Sheet & Tube Co. v. Sawyer, 1952, 343 U.S. 579, 593, 615, 72 S.Ct. 863, 96 L.Ed. 1153, listing 84 seizures of industrial plants and facilities from 1861 through 1952, including the subject of this litigation "Midwest Trucking Operators."

the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. \* \* \* In other words, it deals with what lawyers term the individual's 'interest' in the thing in question. \* \* The constitutional provision is addressed to every sort of interest the citizen may possess. \* \* \*.'' United States v. General Motors Corporation, 1945, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311.

So long as that property was "used in the trade or business," i.e., subject to depreciation, there is nothing to indicate here that Congress, in dealing with governmental seizures, intended to use the term property in Section 117(j) in any narrower sense. If, as the Government argues, there must be acquisition of complete title to make a "conversion" then the express inclusion of these involuntary proceedings (seizure, requisition, condemnation) in Section 117(j) was wholly superfluous. This is so because ample relief would have been available by treating the transaction as a sale or exchange (i.e., exchanging the title and property for cash or the Government's obligation, either recognized or judicially enforced, to pay just compensation).

The question of title likewise has nothing to do with the economic realities of the taking of possession even though it is for an indeterminate period. There is still a change, i.e., conversion, from absolute ownership of a thing having a certain useful life into something else. The something else is (a) the constitutional obligation of the sovereign to pay for the value and (b) the remnant or salvage remaining if and when the chattel is returned. This is not a mere hypothetical possibility. In this case the principal subjects of the just compensation award were the truck-tractors, cargo trailers and pickup trucks. Each vehicle had both an accounting and an actual useful economic life. At the time of this seizure no one knew for what length of time the Government's exclusive possession would continue. It depended on fortuitous events [5] including the arbitrary decisions of labor leaders and world dictators. Possession was essential for ten months. It might just as well have continued for another thirty months.

■ What the Government took then was something more than the "use" of these vehicles. It got forever and irretrievably ten months of the useful life of each vehicle. This could never be replaced. If, for example, the useful economic life of a specific vehicle was three years, and the Government's possession had continued for that time, what the Government "took" on the day of seizure was a truck, what it returned would have been a piece of junk. That certainly is a conversion. If it is, it is still a conversion if subsequent events reduce the period of possession from the entire useful economic life of the chattel to the substantial one of ten months. In either case the Government takes a vehicle with an ascertainable economic life. It returns something less. It has used, it has utilized, it has consumed, it has converted the difference.

■ The same would be true of a taking over, whether by seizure or condemnation, of the remainder of a leasehold interest. Whatever its common law technical implications, the lessee's rights are those of possession and enjoyment. When the Government takes this, it must pay. United States v. General Motors Corporation, 1945, 323 U.S. 373, 65 S. Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390. If the entire remainder of the leasehold term is commandeered, the lessee, as owner of that present interest, has lost it altogether. In its place stands the Government's payment or constitutional

---

5. Possession of Gillette's property terminated June 16, 1945. Germany had just signed the unconditional surrender on May 6, 1945. The "bomb" was obviously being readied for use and was soon to fall on Hiroshima August 6, 1945 and to be followed by the surrender aboard U.S.S. Missouri September 2, 1945.

obligation to pay. The citizen had an interest in a leasehold. Now he has lost that. He has lost it from involuntary seizure, requisition or condemnation. What he has left is a claim. If this is not conversion [6] of one thing into another, then the word has little meaning.

This approach likewise reflects a symmetry with principles of just compensation under governmental acquisitions. The Government argues strenuously that what was awarded was *rent*. To be sure it was computed on the basis of established rental values for such motor truck equipment. But the objective was not to award profits which would have been received, or income which would have been received, either net or gross, from operations or by rental. The objective was to determine the value of the thing taken—the appropriation for an indeterminate time of the exclusive right of possession, direction and control. That value is its probable rental value, but the award is for the value, not the rent. "The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent. Its measure is the amount of that equivalent * * *. But when the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of the value to other potential owners enjoying the same rights. * * * These considerations have special relevance where 'property' is 'taken' not in fee but for an indeterminate period. * * * We agree with both lower courts, therefore, that the proper measure of compensation is the rental that probably could have been obtained, and so this Court has held in the two recent cases dealing with temporary takings. United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; United States v. Petty Motor Company, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729." Kimball Laundry Co. v. United States, 1949, 338 U.S. 1, 5–7, 69 S.Ct. 1434, 1438, 93 L. Ed. 1765.

That would most certainly be pertinent here for the facts are uncontradicted that Gillette was happy as a transport company. It wanted to remain in that business. So much so did it desire to continue, that it and others had the courage collectively to challenge demands of labor organizations which were deemed inequitable. It refused to budge. The Government took over. This is relevant because Gillette was not in the business of *renting* its equipment. It was an operator and wanted to continue to be one. The Government could not compel it to be a renter—i. e., a lessor. It could, of course, by its sovereign power, take, either permanently or indeterminately. But the taking was not a lease, and its obligation was not to pay rent, but to pay just compensation for the value of that right.

Finally, the stipulated facts and the stipulated Opinion and Order of the Claims Commission likewise demonstrate an absolute taking of property through executive seizure. The seizure was peremptory, mandatory and involuntary.

---

6. Under the regulations, it is not necessary to convert the property *into* something else, e. g., cash.

Treasury Regulation 118, Section 39.-117(j)–1(2) provides,

"(2) For the purpose of this section, the 'involuntary conversion' of property is the conversion of such property into money or other property as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof. Losses upon the destruction in whole or in part, theft or seizure, requisition or condemnation of property are treated as losses upon an involuntary conversion *whether or not there was a conversion of the property into money or other property.* For example, if a capital asset held for more than six months, with an adjusted basis of $400, is stolen, and the loss from this theft is not compensated for by insurance or otherwise, the $400 loss is included in the computations under section 117(j)." (Emphasis supplied.)

On the commencement of the strike by the drivers on August 4, the operations of the Midwest Motor Truck Carriers was interrupted. Except for a brief time between August 4 and 11, Gillette was permitted "with the consent of the union" to transport Government freight and war materials. On August 11, 1944, all operations were shut down by the union's strike. On that day, the President issued Executive Order [7] 9462, U.S. Code Congressional and Administrative News 1944, p. 1496. It ordered the Director of the Office of Defense Transportation "to take possession and assume control of, and to operate, or arrange for the operation of, the motor carrier transportation systems of the motor carriers named * * *, including all real and personal property and other assets, wherever situated, used or useful in connection with operation of such systems."

The exclusive dominion, control and direction covered all of Gillette's property, including specifically 55 tractor-trailer combinations, 14 spare tractors, 23 pickup delivery trucks, and 5 passenger service vehicles. In ascertaining just compensation on the vicarious rental value on the industry accepted mileage basis, the Commission found that the tractors and trailer vehicles would have been leased on a minimum of 5,000 miles per month. That means that for the roughly ten months of the seizure these 69 over-the-road vehicles traveled, or would be expected to travel, over 3,450,-000 miles. In that operation the Government got something more than *use*, i. e., carrying capacity of the vehicles. Unlike "the wonderful one-hoss shay * * * that * * * ran a hundred years to a day" and "went to pieces all at once—all at once, and nothing first, just as bubbles * * * when they burst," each mile operated used up a part of the economic life of the vehicle. The part thus "consumed" could not be returned. It was lost and gone forever.

■ There was a seizure. It was involuntary. The Government took over and used property. The property was clearly property used in the trade and business of the Taxpayer. The just compensation [8] received for the taking qualified under Section 117(j). The cause must therefore be reversed and remanded to the Tax Court for further and other consistent proceedings.

Reversed and remanded.

HUTCHESON, Chief Judge (dissenting).

While I do not agree with all that is said in the Eighth Circuit opinion in the Midwest Motor Express case, 251 F.2d 405, affirming the opinion of the Tax Court, 27 T.C. 167, I do agree fully with the result reached therein. I disagree, therefore, with the views expressed in, and the result of, the opinion of the majority in this case, and respectfully dissent therefrom.

7. The Order recited for its authority:
"Now Therefore, by virtue of the power and authority vested in me by the Constitution and laws of the United States, including the act of August 29, 1916, 39 Stat. 645 [10 U.S.C.A. §§ 4742, 9742], the First War Powers Act, 1941 [50 U.S.C.A.Appendix, § 601 et seq.], and section 9 of the Selective Training and Service Act of 1940 as amended by the War Labor Disputes Act [now 50 U.S.C.A.Appendix, § 468], as President of the United States and Commander in Chief of the Army and Navy, it is hereby ordered as follows: * * *."

8. The agreed award, after the settlement, was $157,843.99. This comprised a vicarious net rental allowance of $122,-926.21 and interest as a part of the award at 4% from June 16, 1945, to July 23, 1952, in the amount of $34,917.78. Whether the interest amount of $34,917.-78 requires a different treatment is not before us and has not been determined. See, e. g., Kieselbach v. Commissioner, 1942, 317 U.S. 399, 63 S.Ct. 303, 87 L. Ed. 358; 320 East 47th Street Corp. v. Commissioner, 2 Cir., 1957, 243 F.2d 894; 3B Mertens, Law of Federal Income Taxation, § 22.93, n. 76.